**Larry L. LEININGER, Appellant,**

v.

**Howard C. ANDERSON, Respondent,**

**Minneapolis Royalties, Inc., Defendant,**

**Wayzata Bank & Trust Co., Respondent.**

**No. 46695.**

Supreme Court of Minnesota.

May 20, 1977.

---

Stock, Carroll, Firth & Rosholt and Arthur J. Stock, Minneapolis, for appellant.

David G. Roston, Minneapolis, for Anderson.

Gary A. Thompson, Minneapolis, for Wayzata Bank & Trust.

Heard before YETKA, SCOTT and STAHLER, JJ., and considered and decided by the court en banc.

SCOTT, Justice.

This is an appeal from a judgment of the Hennepin County District Court in favor of appellant Larry L. Leininger and against Minneapolis Royalties, Inc., and Howard C. Anderson, its president, and also in favor of a third defendant and respondent herein, Wayzata Bank & Trust Co., as a holder in due course of two cashier's checks presented to it by Anderson. Anderson and Minneapolis Royalties have not appealed.

Appellant Larry L. Leininger (Leininger) brought this action to recover damages based upon fraud and conversion in the sale of a business. Defendants are Anderson, who sold the business to appellant, the Wayzata Bank & Trust Company (Wayzata Bank), and Minneapolis Royalties, Inc., successor to Anderson's Minneapolis Dexstrand Corporation (Dexstrand), the company being sold. Anderson was the president and principal shareholder of Dexstrand at all relevant times up to January 26, 1973. Leininger wished to purchase the assets of Dexstrand from Anderson. Wayzata Bank held a security interest in the assets of Dexstrand to secure notes of indebtedness at the bank given by Dexstrand and Anderson. Leininger has since incorporated a new corporation known as Minneapolis Dexstrand Corporation, while Anderson now operates a successor firm to Dexstrand known as Minneapolis Royalties, Inc.

In response to a newspaper ad placed by Anderson, Leininger expressed interest in purchasing the assets of Dexstrand. Anderson and Leininger met on January 12, 1973, to discuss the nature of the business and the sale. They continued to meet from January 12 to January 23, on which date Anderson presented Leininger with a sales agreement for the purchase of Dexstrand.

On January 25, Leininger and Anderson each signed one copy of the agreement, and both signed a third copy. Leininger gave Anderson two cashier's checks totaling $20,000, the agreed upon down payment; in return, Anderson promised Leininger in writing a bill of sale for the assets of Dexstrand. These checks were made payable to the order of Minneapolis Dexstrand Corp. and Wayzata Bank as copayees. The sales agreement named Leininger as buyer and Minneapolis Dexstrand Corp. and Wayzata Bank as sellers.

On January 26, Anderson took the agreements and the checks to Wayzata Bank. He endorsed the checks on behalf of Dexstrand. Wayzata Bank declined to sign the sales agreement, because it did not hold an ownership interest in Dexstrand, but merely a security interest in its assets. The bank endorsed the cashier's checks, however, and applied the proceeds pursuant to a letter of instruction from Anderson. From the proceeds, $9,500 was used to satisfy a $10,000 promissory note signed by Anderson and endorsed by Dexstrand; $6,000 was used to satisfy a similar note signed by Dexstrand and endorsed by Anderson; the balance, after payment of interest due on the notes, was credited to the account of Dexstrand. The $6,000 note was assigned by Wayzata Bank to Leininger. The $10,000 note provides some confusion, however. In December of 1972 Anderson had paid $500 on the principal of this note, and had renewed it at $9,500. The $10,000 note was not formally marked cancelled by Wayzata Bank, and it was this note that was assigned to Leininger. The $9,500 note, upon receipt of the cashier's checks, was marked "Paid" and returned to Anderson. Hence, at the time of this transaction, only $9,500 (plus interest) was required to pay this indebtedness—the remaining $500 was placed in the Dexstrand account. The total remainder deposited in the Dexstrand account was $4,284.99. The bank also assigned to Leininger its security interest in the Dexstrand assets, though this assignment was never recorded.

In March 1973, Anderson gave Leininger the bank's assignment letter. He has continued to retain the assigned promissory notes. In September 1973, Leininger was informed by Wayzata Bank that it had not signed the sales agreement, and that no bill of sale was forthcoming.

The basis of Leininger's claims against the bank and Anderson focuses on his allegation that Anderson fraudulently misrepresented the value of Dexstrand's assets, and that the bank, as receiver of the sale proceeds, is liable for conversion of Leininger's funds. Leininger claims that: (1) The business was not worth the $20,000 he paid for it; (2) Anderson did not perform as he had promised; (3) the bank, by accepting his funds, became a party to the sale transaction; and (4) the bank cannot be a holder in due course because it acted in bad faith, on notice, and did not give value for Leininger's cashier's checks. The trial court held that Leininger was entitled to judgment against Anderson for $20,000 less the value of what he received as assets of Dexstrand, but could not recover from Wayzata Bank because it was a holder in due course of the checks. The trial court did not make explicit findings on the elements of the holder-in-due-course status of Wayzata Bank.

Leininger disputes both aspects of the trial court's decision. He argues at great length, and with considerable repetition, that Wayzata Bank is not a holder in due course and is thus fully exposed to liability. He further contends that regardless of the bank's holder-in-due-course status, it is liable in conversion, and that by accepting the drafts the bank became a full party to the sale agreement, making it liable for any alleged fraud in the transaction. As to both Anderson and the bank, Leininger argues that (1) since he attempted to cancel the contract on May 1, 1973, the contractual setoff remedy adopted by the trial court is inappropriate, and (2) he is entitled to all other forms of damages he has suffered because of the alleged fraud, totaling some $223,000. Wayzata Bank responds with some brevity to each of these arguments.

Wayzata Bank also comments upon the scope of review on appeal. It asserts that the review is only to determine "whether the record on appeal sustains the findings of the trial court and whether the findings sustain the conclusions of law."

The following legal issues present themselves:

(1) What is the scope of review in this case, and where do the burdens lie?

(2) Was Wayzata Bank a holder in due course of the cashier's checks?

(3) Regardless of its holder-in-due-course status, is Wayzata Bank nevertheless liable to Leininger for conversion?

(4) Was Wayzata Bank a party to the sales contract, and thus liable for alleged fraud in and breach of that contract?

(5) Was the trial court correct as to the measure of Leininger's damages?

1. The scope of review in this case must, of necessity, be narrow. As pointed out by the respondent, the appellant appealed the trial court's judgment without moving for a new trial or amended findings. Further, the record on appeal has been left deliberately incomplete by the appellant—respondent Wayzata Bank's motion for a substantially complete transcript was opposed and denied. Hence, the record on appeal contains the complete testimony of Jan P. Boswinkel, senior vice-president of Wayzata Bank, and the complete (but brief) testimony of Louis B. Oberhauser, attorney for the bank, but only contains a very short excerpt of the testimony of Anderson and none of the testimony of Leininger, who is plaintiff and appellant. It should be obvious that these selections are meant to focus on the bank.

The burden on appeal is therefore heavy upon appellant to show that, based on the record he has provided, the trial court was clearly erroneous in its factual findings, or mistaken in its legal conclusions. The burden should be upon the appellant to show, on each issue presented, either that the record clearly contradicts the trial court's findings or that the trial court's legal con-

clusions do not follow from its findings of fact. This is the proper burden upon a party which has chosen to bypass post-trial motions and to rely on a limited record in a complicated matter where fraud and conversion are alleged.

2. In light of the above, the question as to whether Wayzata Bank was a holder in due course of the cashier's checks should be rephrased as follows: (a) Is the trial court's conclusion of law that Wayzata Bank was a holder in due course contradicted by its own findings of fact? (b) Does the record on appeal show that the trial court was clearly erroneous in not finding facts tending to a different conclusion?

The requirements for a holder in due course are set out in Minn.St. 336.3—302: A holder in due course is a holder who takes the instrument for value, in good faith, without notice that it is overdue, dishonored, or subject to a claim or defense by any person. A "holder" is defined by Minn. St. 336.1—201(20) to be a person who is in possession of an instrument drawn, issued, or endorsed to him or his order or in blank. (For the definition of "value," see § 336.3—303; for "good faith," § 336.1—201(19); for "without notice," § 336.3—304.) The rights of a holder in due course are set out in § 336.3—305: He takes free of *all* claims by *any* person, and free of most defenses.

Here it is uncontested that the bank was a holder of the cashier's checks: It was a copayee (a payee may be a holder in due course, see § 336.3—302[2]), it was in possession, and Anderson had endorsed both checks in blank for Minneapolis Dexstrand, the other copayee. For numerous reasons, however, Leininger asserts that Wayzata Bank did not satisfy the "for value," "good faith," and "without notice" requirements of § 336.3—302(1).

■ Leininger argues that Wayzata Bank did not give value for the following reasons: Leininger bargained for a bill of sale; the bank did not sign the sales agreement; Leininger did not receive a bill of sale; therefore the bank did not give value. The Uniform Commercial Code rule is otherwise. Minn.St. 336.3—303, defining "taking for value," reads as follows:

"A holder takes the instrument for value

"(a) to the extent that the agreed consideration has been performed or that he acquires a security interest in or a lien on the instrument otherwise than by legal process; or

"(b) when he takes the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due; or

"(c) when he gives a negotiable instrument for it or makes an irrevocable commitment to a third person."

The facts of this case clearly show the bank to have met these criteria. The trial court's finding of fact on this issue, which is well supported by the testimony of Boswinkel, indicates that a large portion of the proceeds of Leininger's cashier's checks was applied to satisfy the two notes on which Dexstrand was either primarily or secondarily liable, plus interest. This application falls under § 336.3—303(b) as "payment of * * * an antecedent claim against any person whether or not the claim is due." The remaining $4,284.99 was placed in the form of a check payable to Dexstrand. Anderson endorsed this check on behalf of Dexstrand and the check was deposited to Dexstrand's account. This transaction comes under § 336.3—303(c)—the bank gave a negotiable instrument for this part of the proceeds. Taken together, the bank retained no portion of the proceeds of the checks for its own benefit, but rather the checks were used to clear the obligations of Dexstrand to the bank with the remainder being credited to the account of Dexstrand. The bank further assigned its security interest in Dexstrand's assets to Leininger, which would come under § 336.3—303(a) as part of the "agreed consideration" pursuant to Anderson's instructions. The facts therefore show that the bank did give value for the cashier's checks as required by Minn.St. 336.3—303.

The argument of appellant that the "invented consideration" was not performed is inapposite in its focus on contractual consideration. The bank took no part in the

negotiations between Leininger and Anderson, nor did it sign the sales agreement. Even though it was Leininger's understanding that the bank was to be a party to the sale, at no time did the bank form a contractual relationship with Leininger involving a promise to deliver a bill of sale—this promise was made by Anderson without the bank's knowledge or approval. The bank accepted the checks and applied them as it was instructed by its attorney and Anderson, in a manner complying with the requirements of § 336.3—303 as shown above. If there was a failure of consideration in the sale transaction, Leininger's remedy in contract would lie against Anderson only, since the bank had no contractual obligation to Leininger.

Leininger also contends on a number of grounds that Wayzata Bank fails the "without notice" test. This requirement is given by Minn.St. 336.3—304. Leininger asserts that sections (1) and (2) are applicable:

"(1) The purchaser has notice of a claim or defense if

"(a) the instrument is so incomplete, bears such visible evidence of forgery or alteration, or is otherwise so irregular as to call into question its validity, terms or ownership or to create an ambiguity as to the party to pay; or

"(b) the purchaser has notice that the obligation of any party is voidable in whole or in part, or that all parties have been discharged.

"(2) The purchaser has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty."

Leininger first argues that Wayzata Bank had knowledge of defenses to the instrument following its refusal to sign the sales agreement, those defenses being fraud, conversion, and breach of contract. Although Leininger alleges that Wayzata Bank had knowledge of numerous facts on January 26, the day of the sale, the central fact appears to be that it "knew unequivo-cably that a sale was intended." There is little doubt Boswinkel at least knew that much, since he testified he did see the sale agreements and declined to sign them on behalf of the bank. The bank acted, however, on the advice of its attorney and the instructions of Anderson in assigning the notes and the security interest and applying the proceeds of the checks to satisfy Dexstrand's obligations to the bank. There was no finding by the trial court, and there is no evidence in the record, that the bank had any knowledge beyond the fact that a separate agreement accompanied the checks. Such knowledge is specifically excepted from the "notice" requirement by Minn.St. 336.3—304(4)(b):

"(4) Knowledge of the following facts does not of itself give the purchaser notice of a defense or claim:

\*　　\*　　\*　　\*　　\*　　\*

"(b) That it was issued or negotiated in return for an executory promise or accompanied by a separate agreement, unless the purchaser has notice that a defense or claim has arisen from the terms thereof."

Leininger next asserts that the bank was on notice under § 336.3—304(2), quoted above, in that Anderson as a fiduciary negotiated the checks to the bank in payment of his own debt. It is true that the $9,500 note paid off by the proceeds of the Leininger checks (although the prior $10,000 note was actually assigned to Leininger as noted above) was signed by Anderson personally. Further, the bank was aware of this fact and also was aware that the transaction involved was the sale of Dexstrand's assets. Such a sale might often involve payment of the company's prior debts by the buyer, but would ordinarily not involve the payment of the seller's personal debts.

The trial court found that the $10,000 note was signed by Anderson personally and endorsed by Dexstrand. The purpose of this loan was to help Dexstrand "for materials at a preferential rate." The loan was therefore for the benefit of Dexstrand, but pledged on Anderson's personal credit. It was fair for Wayzata Bank to assume

that while Anderson owed this sum to the bank, Dexstrand owed it to Anderson. As long as the note at the bank remained outstanding, Dexstrand would remain liable to Anderson as a creditor as well as to the bank (secondarily) on Anderson's note. Under these circumstances, it was not unreasonable for the bank to believe that by applying the proceeds of the checks to pay this loan in conjunction with a sale of the assets, it was not acting according to the wishes of a fiduciary (Anderson) in breach of his duty. The findings of the district court and the record on appeal do not permit the inference that the bank knew Anderson to be acting in breach of fiduciary duty when he instructed the bank to pay this note out of the Leininger checks. The facts only permit the inference that the bank retired this note out of the Leininger funds believing that this was for the purpose of eliminating Dexstrand's secondary liability on the note, and possibly its primary liability to Anderson for the loan by means of the assignment. The sum and substance of the transaction, from the bank's point of view, was to cut it out of the matter entirely, leaving all debts and contract obligations between Leininger and Anderson. If Leininger did not receive the agreed-upon return consideration from Anderson, his remedy was against Anderson.

■ Leininger also contends that Wayzata Bank was on notice under § 336.3—304(1)(a), in that the sales agreement was materially altered by the crossing off of the bank's name from two of the three copies. This argument is totally without substance. Section 336.3—304(1)(a) clearly refers to "the instrument," which by § 336.3—102(1)(e) means "negotiable instrument." The sale agreement most certainly does not satisfy the requirements of § 336.3—104 for a "negotiable instrument." Leininger's argument that this aspect of "without notice" extends to a separate agreement related in some way to the negotiable instruments is without support in the Code, which controls these matters under Minnesota law.

Leininger next turns to the "good faith" requirement of § 336.3—302, and lists three

reasons why Wayzata Bank ran afoul of this provision. First, the bank had a duty to inquire into the "irregular" nature of the transaction; second, the transaction was "preposterous," making the bank's participation commercially unreasonable; third, in altering the transaction pursuant to Anderson's instructions without contacting Leininger or obtaining his approval, the bank "closed its eyes" to what it knew.

■ "Good faith" is defined by the Code in § 336.1—201(19) as "honesty in fact in the conduct or transaction concerned." This definition is to be distinguished from that given in § 336.2—103(1)(b) for merchants, which includes not only honesty in fact but also the "observance of reasonable commercial standards of fair dealing in the trade." The implication of Leininger's first "bad faith" argument is that the bank is to be held to this additional standard, which is not the case. The Minnesota interpretation of "good faith" as in § 336.1—201(19) is that it requires honesty of intent rather than the absence of circumstances which would put an ordinarily prudent holder on inquiry. *Eldon's Super Fresh Stores v. Merrill Lynch*, 296 Minn. 130, 207 N.W.2d 282 (1973).

■ The district court made no finding which would indicate that Wayzata Bank failed the "honesty of intent" test. The evidence shows that Wayzata Bank was dealing with a long-time and trusted customer in Anderson, who had been known by Boswinkel for some 15 years. Further, the bank was acting mainly on the advice of its attorney, Oberhauser, whom it had no reason to believe would deliberately structure a dishonest or illegal transaction. The instruments themselves were unmistakably valid cashier's checks drawn on the First Southdale National Bank, and showed no sign of alteration or irregularity. Despite appellant's insistence that the transaction was "preposterous" and "a trick" from his point of view, he has supplied no evidence that the bank viewed it the same way. There is similarly no evidence that the bank "closed its eyes" to what it allegedly knew. It is true that the transaction was restruc-

tured from what Leininger had originally expected. He accepted this risk, however, by turning over his cashier's checks to Anderson. The bank agreed to the method adopted by Anderson on Oberhauser's advice; there was nothing inherently irregular or suspicious about the method chosen. Finally, it was Boswinkel's testimony that he did not read the sale agreement itself, but only took the position that he could not sign because the bank had nothing to sell. The district court found that the bank was unaware of the discussions and understanding reached between Leininger and Anderson. Hence it was not willful bad faith for the bank to agree to a transaction which satisfied Dexstrand's obligations to the bank in exchange for transferring all of the bank's interest in Dexstrand to Leininger, the remitter of the checks.

Viewed as a whole, neither the findings of the district court nor the limited record on appeal supports the assertion that Wayzata Bank was not "[honest] in fact in the conduct or transaction concerned." Minn.St. 336.1—201(19).

■ 3. Leininger argues that the bank's conduct in the sale transaction constituted conversion of the proceeds of the cashier's checks. There is little doubt that the bank exercised some dominion over these checks, which was to be expected since the bank was a copayee. The other two aspects of the tort of conversion listed by Leininger, namely, exercise of dominion (1) inconsistent with plaintiff's rights and (2) in repudiation of those rights, were not similarly present in Wayzata Bank's conduct.

The finding of the district court was that "Leininger was aware that part of the $20,-000 consideration for the sale of assets would be used to satisfy debts at the bank for which the bank held a security interest in assets of Dexstrand." This security interest applied only to the $6,000 note on which Dexstrand was primarily liable. Leininger would have no basis to complain that the remainder of the proceeds after payment of the second note, or $4,284.99, was deposited to the account of Dexstrand, which he was acquiring. There is no evi-

dence that Leininger in fact objected to any particular use of his checks, so long as he received title to the business. He reasonably relied upon Anderson to provide this by means of transactions with the bank.

Leininger did not go to the bank until September 1973, when he was told he would not receive a bill of sale from the bank. There is no indication even at this point that he had any objection to the use of his checks so long as he was in de facto possession of the business, except that he had not received a bill of sale. His dissatisfaction with the form of the transaction, however, does not imply that the bank had acted inconsistently with his rights. The bank reasonably believed that Leininger issued the checks to acquire full right and title to Dexstrand, and this necessarily included the bank's interests as a secured creditor. The proceeds of the checks, while perhaps not applied exactly as Leininger had expected, were not so applied by the bank as to defeat his right to ownership of Dexstrand. The application of some portion of the proceeds to satisfy Dexstrand's obligations to the bank was not inconsistent with Leininger's right to own and operate Dexstrand free and clear of outstanding debts, nor was it destructive of Leininger's right to such ownership. If Leininger believes he has received less than he was promised in acquiring Dexstrand, his remedy is against Anderson as previously stated.

4. Appellant contends that when Wayzata Bank accepted and cashed the cashier's checks, it became obligated by the terms of the sales agreement. Neither the record nor the Code supports this contention.

■ First, and most importantly, Wayzata Bank expressly refused to sign the sales agreement. Its position that it did not have an ownership interest in the assets of Dexstrand, but only a security interest, was correct under the circumstances. The holder of a security interest would not ordinarily become involved in a sale of the security beyond seeing to it that its interest is satisfied or otherwise protected. Second, the clear import of the U.C.C. is that negotiable instruments may not be used by parties to

express obligations beyond that given in § 336.3—104(1)(b), namely an unconditional promise to pay a sum certain. Section 336.3 —119 deals specifically with the problem of negotiable instruments and related agreements. Minn.St. 336.3—119(1) states:

"As between the obligor and his immediate obligee or any transferee the terms of an instrument may be modified or affected by any other written agreement executed as a part of the same transaction, except that a holder in due course is not affected by any limitation of his rights arising out of the separate written agreement if he had no notice of the limitation when he took the instrument."

This raises two questions: What is the effect of the sales agreement herein if (a) the bank is not a holder in due course, and (b) if it is a holder in due course?

The answer to these questions must be the same, because the sales agreement itself in no way purports to affect the terms or negotiability of the checks. The only provision of the contract expressly referring to the checks is paragraph I:

"In consideration of this Agreement the Buyer, upon execution hereof, shall immediately tender to the Seller his certified checks in the amount of Seventeen-Thousand Five-Hundred & No/100 Dollars ($17,500.00) down payment and Two-Thousand Five-Hundred & No/100 Dollars ($2,500.00) in advance royalties, payable to The Wayzata * * * Bank & Trust Co., (holder of a General Assignment Agreement and Security Notes as collateral on loans for Minneapolis Dexstrand Corporation) and Minneapolis Dexstrand Corporation."

This clause establishes only two requirements: (1) That the checks be in the amounts of $17,500 and $2,500 and (2) that they be payable to Wayzata Bank and Dexstrand. The Leininger checks complied with both these requirements. Nothing else in the contract or on the checks purports to affect the terms of the checks; the only connection is the above clause. The U.C.C. Comments to § 336.3—119 make clear that negotiable instruments will not be affected absent some express term in the contract, and even then, contradictions may be controlled by the instrument itself. 21B M.S.A. § 336.3—119, U.C.C. Comments 2, 3, state:

"2. Other parties, such as an accommodation indorser, are not affected by the separate writing unless they were also parties to it as a part of the transaction by which they became bound on the instrument.

"3. The section applies to negotiable instruments the ordinary rule that writings executed as a part of the same transaction are to be read together as a single agreement. As between the immediate parties a negotiable instrument is merely. a contract, and is no exception to the principle that the courts will look to the entire contract in writing. Accordingly a note may be affected by an acceleration clause, a clause providing for discharge under certain conditions, or any other relevant term in the separate writing. 'May be modified or affected' does not mean that the separate agreement must necessarily be given effect. There is still room for construction of the writing as not intended to affect the instrument at all, or as intended to affect it only for a limited purpose such as foreclosure or other realization of collateral. If there is outright contradiction between the two, as where the note is for $1,000 but the accompanying mortgage recites that it is for $2,000, the note may be held to stand on its own feet and not to be affected by the contradiction."

Therefore, even had Boswinkel thoroughly examined the sales agreement on behalf of Wayzata Bank, he would have discovered that the checks and the agreement were consistent, with neither purporting to place limitations upon the other. This set of facts is discussed in the Code Comment quoted above, as where the "writing [is] not intended to affect the instrument at all." In such a case the negotiable instruments stand by their own express terms, and acceptance of them cannot be construed as acceptance of terms in the separate con-

tract to which the bank was not a signatory. Hence, causes of action arising out of the separate contract would not be available against Wayzata Bank for accepting the checks.

5. The trial court held that the measure of Leininger's damages against Anderson was "to be computed by subtracting the value of all assets transferred to Leininger under the agreement of January 25, 1973, from the sum of $20,000 * * *." In his amended complaint Leininger seeks general damages of $175,000 and special damages of $48,000, totaling $223,000. Anderson and Minneapolis Royalties counterclaimed for lost royalties totaling $225,000. Needless to say, this is a case where the claims of parties vastly exceed any showing of actual damages by the evidence. Leininger has received all of the bank's interest (both notes and the security interest), and has presumably received the assets of the business, whatever they were. The question is whether he received what he was promised by Anderson. He alleges he did not, and claims he attempted to cancel the agreement on May 1, 1973.

 The trial court made no explicit finding on rescission or cancellation of the contract, nor is there evidence in the record on appeal that Leininger effectively rescinded or cancelled the contract. Any rights of Anderson to contract royalties have been waived, since the trial court dismissed his counterclaim for royalties and he has not appealed the judgment. In essence, the trial court found that Leininger had received less than he had paid for. The record on appeal permits no further conclusion, nor does it provide any evidentiary basis for dispute with the trial court's finding on this issue.

The trial court concluded that:

"Larry L. Leininger is entitled to judgment against Howard C. Anderson individually and against Minneapolis Royalties, Inc., of which Anderson was president, for a sum to be computed by subtracting the value of all assets transferred to Leininger under the agreement of January 25, 1973, from the sum of $20,-

000. If the parties are unable to stipulate as to the value of such assets, any party may petition the court for a hearing at which hearing the court will hear evidence, determine values, and order judgment to be outlined in a specific amount."

We therefore affirm in all respects and remand only for the determination of damages by the trial court.

Affirmed and remanded for proceedings consistent with this opinion.