538 F.2d 397
 176 U.S.App.D.C. 49, 19 UCC Rep.Serv. 171,
19 UCC Rep.Serv. 534
 Claude L. SLAUGHTER et al., Appellees,
v.
JEFFERSON FEDERAL SAVINGS AND LOAN ASSOCIATION et al., and
Montgomery FederalSavings and Loan Association,
Appellants.
Claude L. SLAUGHTER et al., Appellees,
v.
JEFFERSON FEDERAL SAVINGS AND LOAN ASSOCIATION and Eastern
Federal Savings andLoan Association et al., Appellants.
 Nos. 74-1178 and 74-1179.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 6, 1975.
Decided April 28, 1976.
Rehearing and Rehearing En Banc Denied June 21, 1976.
 
 William H. Brain, Kensington, Md., for appellants in No. 74-1178.
 Fred M. Vinson, Jr., Washington, D. C., with whom Kenneth C. Bass, III, Reston, Wash., E. Tillman Stirling, Washington, D. C., were on the brief for appellants in No. 74-1179.
 Norman C. Barnett, Washington, D. C., with whom Marilyn Fisher, Baltimore, Md., was on the brief for appellees.
 Before MacKINNON and ROBB, Circuit Judges, and CHRISTENSEN,* Senior District Judge for the District of Utah.
 Opinion for the Court filed by Circuit Judge ROBB.
 ROBB, Circuit Judge:
 
 
 1
 These cases are appeals by two lending institutions, Jefferson Federal Savings & Loan Association and Montgomery Federal Savings & Loan Association, from judgments entered against them in the District Court. The opinion of the District Court is reported as Slaughter v. Jefferson Federal Savings & Loan Association, 361 F.Supp. 590 (D.D.C.1973).
 
 
 2
 The action in the District Court was the principal civil action brought by victims of the Monarch Construction Corporation "home improvement" fraud which flourished in the inner city of Washington, D. C. in 1964-65. Although begun as a class action for damages and equitable relief against all parties involved in the fraud, the action as it comes to us has narrowed to the individual claims of 37 owners of dwelling houses against Jefferson Federal Savings & Loan Association and Montgomery Federal Savings & Loan Association, the holders of first trust notes on the houseowners' properties. Thirty of the notes in question are held by Jefferson Federal, seven by Montgomery Federal.
 
 
 3
 The evidence before the District Court justified it in finding, as it did, that in 1964 the officers of Monarch and others devised and executed a scheme to defraud the owners of dwelling houses in the decaying inner city of Washington, D. C. These houses were generally of the older rowhouse type and needed extensive repairs. The owners were usually elderly blacks with low incomes, having limited education and were unsophisticated in financial transactions.
 
 
 4
 The keynote of the Monarch scheme was a plan known as the "American Towne House Program". This plan called for the rehabilitation or restoration of houses by the installation of Early American or "Georgetownfronts". These fronts consisted of aluminum clapboard siding, new windows, a new door, shutters, railing, a lantern, and, where necessary, a new concrete porch. The plan was widely advertised and endorsements by senators, congressmen and community leaders were secured. Salesmen with "pitch books" canvassed the neighborhoods to sell the plan to householders. As part of their "pitch" the salesmen made material misrepresentations concerning the interest of the government in the American Towne House Program and the benefits to be derived from the installations of a townhouse front.
 
 
 5
 When a houseowner agreed to purchase a townhouse front the Monarch salesman would obtain a credit application from him, listing the trust debt on the property, his income, and his other debts. The salesman would then prepare a contract which stated the total price for the work and the monthly payment required. The contract price for the work would be substantially excessive.
 
 
 6
 When a credit application and contract had been signed, copies were given to Earl Lapin, a real estate broker, trading as Empire Realty Services. Lapin who had previously been a Monarch employee and was familiar with Monarch's methods would then advise whether a new trust loan on the property could be secured. If Lapin gave the word Monarch would in many instances send out a workman to begin immediately a token start on the work. This practice, known as "spiking", was done to prevent the houseowner from withdrawing from the contract. Lapin on behalf of the houseowner would thereafter submit an application for a first trust loan to Jefferson Federal or Montgomery Federal. Copies of the Monarch contracts were submitted to Jefferson Federal along with the loan applications. The proof at trial did not establish that Montgomery Federal received the Monarch contracts.
 
 
 7
 Upon receipt of a loan application an appraisal committee from the lender would view the property in question, determine a loan value, and make a loan recommendation. The loan recommendation was then acted on by a loan committee, which included among its members the appraiser. When a loan commitment was given to Lapin he would tell Monarch to commence the work. The loans were generally sufficient to pay off existing trust notes on the property, together with the other debts of the householders, the cost of the Monarch work, and other costs such as Lapin's commission.
 
 
 8
 In the case of Jefferson Federal the loans were expressly conditioned upon completion of the work, and no proceeds were disbursed until Jefferson Federal was satisfied, by inspection or otherwise, that the work had been completed. Montgomery Federal did not make its loans subject to satisfactory completion of the work.
 
 
 9
 When the work was completed a settlement took place at a title company and before a settlement officer selected by Lapin. In most cases the same title company and settlement officer were used. Attending the settlements were Lapin, the house- owner, the settlement officer, and sometimes an official from Monarch. No representative of Jefferson Federal or Montgomery attended any settlement, but settlement sheets were sent to both lending institutions.
 
 
 10
 At settlement Lapin would secure his real estate broker's commission which averaged 4% or 5% of the loan. The lenders would be paid their points and extra interest charges. Occasionally, a second trust would be imposed on the property because after paying existing debts there was not enough left of the first trust to cover the contract price. Settlements were conducted in a hurried fashion and frequently left the householder confused as to how much he would have to pay and to whom.
 
 
 11
 In early 1965 the Federal Housing Administration began an investigation of Monarch and in February of that year an FHA investigator talked to a Jefferson Federal official about Monarch and examined some loan jackets relating to Monarch. By the end of 1965 Monarch had collapsed and gone out of business. Thereafter, United States Postal Inspectors undertook an investigation and grand jury proceedings were instituted. In 1970 three officials of Monarch, including its president, pleaded guilty to charges of mail fraud. In April 1970 the United States Attorney's Office sent notices to the Monarch victims advising them of the guilty pleas and of the possibility that they might have civil claims. This action was commenced in January 1971.
 
 
 12
 The District Court found that the first trust notes held by Jefferson Federal and Montgomery Federal were obtained through misrepresentations to finance unconscionable home improvement contracts. In so finding the court held that the unconscionable results were induced by fraudulent material misrepresentations reasonably relied upon by plaintiffs and by willful concealment of material facts. The court ruled that Jefferson Federal and Montgomery Federal were subject to the houseowners' defenses to the notes, based on claims of fraud and unconscionable dealings, because they had failed to sustain their burden of proving that they held the notes in due course.
 
 
 13
 The court ordered that the notes be cancelled and that each houseowner be treated as having made a "new loan" at the same rate of interest and for the period stated in the original loan, in an amount equal to the true value received from the original transaction. On November 6, 1973 the court entered its final order setting out the amount of the "new loans". This appeal followed.
 
 
 14
 Our consideration of the case starts from the premise that in arranging for the first trust notes Monarch and its agents were guilty of a mean and unconscionable fraud. As we have said the findings of the district judge in this respect are fully sustained by the evidence. At the same time we must bear in mind that the investigation and disclosure of the fraud did not occur until after the loans had been made; although the loans were made in 1964 and 1965 the Monarch officials did not plead guilty to fraud until 1970, five years later, and this action was not commenced until January 1971. We must therefore beware of the temptation to view the plaintiffs' case with the perfect vision of retrospect.
 
 
 15
 We turn to the question whether the two lending institutions met their burden of showing that they held the notes as holders in due course. 28 D.C.Code § 3-307(3); United Securities Corp. v. Bruton, 213 A.2d 892 (D.C.Ct.App.1965). We think they did.
 
 
 16
 The District of Columbia Code § 28:3-302 defines a holder in due course as "a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice . . . of any defense against it or claim to it on the part of any person." Good faith is defined as "honesty in fact in the conduct or transaction concerned". 28 D.C.Code § 1-201(19). Section 28:1-201(25) provides that a person has "notice" of a fact when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) "from all the facts and circumstances known to him at the time in question he has reason to know that it exists."[1]
 
 
 17
 The District Court properly found that neither Jefferson Federal nor Montgomery Federal was a party to the fraud practiced by Monarch, nor did they have direct knowledge of its existence. Indeed, the court found that Jefferson Federal knew nothing about Monarch and never investigated Monarch or Lapin; and on the evidence the same finding would have to be made with respect to Montgomery Federal. Nor was there any finding that either lending institution knew what occurred at the settlement proceedings. Further, the court found there was no proof that the procedures followed by the two institutions differed from those followed by other responsible first trust lenders refinancing to aid home improvement purchases. The interest rates charged were found to be legal. Nevertheless the court concluded that from the facts and circumstances known to them at the time they took the notes both institutions had reason to know of the misrepresentation and unconscionable dealing practiced by Monarch, and so were on notice of these defenses. We must therefore examine the facts and circumstances upon which the court relied.
 
 
 18
 The court concluded that the following facts charged the lending institutions with notice of the Monarch fraud: (1) in presenting the loan applications Lapin was obviously acting as agent for both Monarch and the prospective borrowers, principals whose interests might well be in conflict; (2) Lapin "peddled" a series of loans from the two institutions to customers of Monarch[2] who lived in the "ghetto areas" of the city and in many cases were of "limited intelligence" and heavily burdened with debt; (3) the appraisers for the lending institutions saw the properties and the work being done and knew what the contract charges were; (4) the settlement sheets, and in the case of Jefferson Federal both these sheets and the Monarch contracts, revealed "irregularities" which should have been apparent. From these circumstances, which the court characterized as "irregularities and indicia of fraud" the court concluded that the lending institutions were under a duty to make inquiries, to make certain their services were not being "misused" by Monarch, and that failing to do this they did not act in good faith but were on notice because they "should have known".
 
 
 19
 Courts deny holder in due course status to a noteholder who was involved in or intimately connected with the sale or transaction which generated the note; having taken part in the original transaction with the borrower the noteholder cannot thereafter stand aloof as a holder in due course and in good faith. Many of the cases relied upon by the plaintiffs and by the District Court are such cases. Calvert Credit Corp. v. Williams, 244 A.2d 494 (D.C.Ct.App.1968); Westfield Investment Co. v. Fellers, 74 N.J.Super. 575, 181 A.2d 809 (1962); Unico v. Owen, 50 N.J. 101, 232 A.2d 405 (1967); Mutual Finance Co. v. Martin, 63 So.2d 649 (Fla.1953); See Randolph National Bank v. Vail, 131 Vt. 390, 308 A.2d 588 (1973). We have no quarrel with these decisions but we do not find them helpful when applied to the facts of the case before us. In our case, as the District Court found, neither lending institution took any part in the activities of Monarch, or knew anything about them. In other words, if the lenders are to be charged with notice and bad faith that charge must rest, not upon any intimate connection or relationship between the lenders and Monarch, but upon other specific facts known to them.
 
 
 20
 The District Court thought Lapin's dual agency and the educational and intellectual status of the Monarch customers were facts which should have suggested fraud on the part of Monarch. We are unable to accept the court's reasoning. All Monarch customers by definition were persons of sufficient substance and ability to have acquired title to their own houses and many of them, as the court pointed out, had previously engaged in mortgage transactions. We see nothing in their situation that should have caused the lenders to believe, or even suspect, that the contracts with Monarch had been induced by fraud. As for Lapin's dual agency we perceive no logical nexus between this fact and knowledge or suspicion of fraudulent representations by Monarch to its customers.
 
 
 21
 We have examined the settlement sheets which were submitted to both Jefferson Federal and Montgomery Federal, and the Monarch contracts which were before Jefferson Federal. The District Court found that these "contracts and settlement sheets were at their disposal and revealed both internal irregularities and contradictions between the two documents". The court did not point to any particular irregularities or contradictions and our study has failed to disclose anything of sufficient gravity to put the lending institutions on notice of the possibility of fraud. Finally, although appraisers from the two institutions viewed the premises, and Jefferson Federal required a showing that the promised work had been completed, the function of the appraisers was merely to determine loan value before the loans were made and the work was done, not to cost the proposed improvements or repairs.
 
 
 22
 Analysis reveals an additional flaw in the District Court's conclusion and in the methodology employed to reach it. As we have seen the District of Columbia Code § 28:1-201(25) provides that a person has notice of a fact when "from all the facts and circumstances known to him at the time in question he has reason to know that it exists." (Emphasis supplied) In this case the "time in question" with respect to each note is of course the time when that note was taken by the lender. The District Court however proceeded upon the theory that the critical time was the same for all the notes, the first as well as the last. Applying this theory, the court charged the lenders, at the time they took the first notes, with knowledge of the facts and circumstances existing when the last notes were taken. Since there was a series of notes, taken over a period of many months, the facts and circumstances at the beginning were obviously different from those existing at the end of the period. By coloring all the transactions with the same factual pigment the court painted with too broad a brush.
 
 
 23
 As the District Court observed there is no rule of thumb to be automatically applied in determining whether the holder of a note holds it in due course. Each case must rest on its own facts. With this proposition in mind we have carefully examined the cases principally relied upon by the plaintiffs, and in which although there was no intimate relationship between the parties the court held that the facts deprived the noteholders of holder in due course status. Without discussing the cases in detail it is enough to say that in each the noteholder knew of certain specific facts which were sufficient to put him on notice. Thus in Blow v. Ammerman, 121 U.S.App.D.C. 351, 350 F.2d 729 (1965), there was evidence that the holder of a note, given in payment for certain paintings, knew the paintings were frauds. In United Securities Corp. v. Bruton, 213 A.2d 892 (D.C.Ct.App.1965) the noteholder failed to sustain its burden of proof because it offered no evidence as to the price paid for the note, why it was purchased so promptly after execution, and the relationship between the holder and the payee. In Otten v. Marasco, 353 F.2d 563 (2d Cir. 1965), the noteholder took stolen bonds as security for a loan to a company he knew to be in financial difficulty, made the loan in a circuitous fashion, and although he knew the bonds were now owned by the borrower, made no inquiry into the borrower's authority to pledge them. In Winter & Hirsch, Inc. v. Passarelli, 122 Ill.App.2d 372, 259 N.E.2d 312 (1970) the lender advanced money for a usurious loan before the loan was formalized and then purchased the $16,260 note for $11,000. General Investment Corp. v. Angelini, 58 N.J. 396, 278 A.2d 193 (1971) involved a note given for home repairs. The note when purchased was undated and although it provided that installment payments should commence sixty days after completion of the work the lender purchased it only nine days after the contract for the repairs was executed, and made no inquiry to ascertain whether the work had been completed. We think these cases are plainly distinguishable on their facts from the case before us. Here there were no comparable red lights to flash warnings to the lenders.
 
 
 24
 We share and applaud the District Court's concern for the innocent houseowners who were victimized by the Monarch fraud; but notwithstanding this concern we are bound to hold that the court's findings as to notice and lack of good faith are clearly erroneous and that the law does not support the judgments entered against the lending institutions. Accordingly the judgments are
 
 
 25
 Reversed.
 
 On Suggestion for Rehearing En Banc
 Civil Action 257-71
 
 26
 Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.
 
 ORDER
 
 27
 PER CURIAM.
 
 
 28
 The suggestion for rehearing en banc and memorandum in support thereof filed by appellees Claude L. Slaughter et al. having been transmitted to the full court and there not being a majority of the judges in regular active service in favor of having these cases reheard en banc, it is
 
 
 29
 ORDERED by the court en banc that the aforesaid suggestion for rehearing en banc is denied.
 
 
 30
 LEVENTHAL, Circuit Judge, did not participate in the foregoing order.
 
 
 31
 Statement of J. SKELLY WRIGHT, Circuit Judge, in Which BAZELON, Chief Judge, and McGOWAN and SPOTTSWOOD W. ROBINSON, III, Circuit Judges, Join, of Reasons for Voting for Rehearing En Banc.
 
 
 32
 This case involves an extensive consumer fraud operation in the District of Columbia. Innumerable inner city homeowners were bilked out of their homes through the customary "holder in due course" technique commonly used in home improvement frauds of this kind. In finding that appellants were not holders in due course[1] of the notes which had admittedly been obtained by fraud from the homeowners, District Judge Gesell wrote:
 
 
 33
 In concluding that Jefferson and Montgomery were not holders in due course, the Court has weighed the totality of the circumstances shown by the proof. It must be borne in mind that neither of these concerns stand in the same position they could readily urge if, as part of their general business, they had occasionally written a first trust loan generated by Monarch. Their volume of Monarch business was in each case continuous and substantial. Their representatives knew that Monarch's contracts were being written on marginal properties in the ghetto areas of the city; that many of Monarch's customers were of limited intelligence and, as a class, were apt to be heavily burdened with consumer and other debt measured by their apparent income levels; and that many were being refinanced out of other satisfactory notes of reputable financial institutions having lower interest rates and lower monthly payments. Their trained real estate men saw the properties and the work being done and had access to the contract charges they were helping to finance.
 
 
 34
 Rather than make obvious inquiry into Lapin's bona fides and the contract requirements and settlement adjustments, they chose to be ignorant by trying to insulate themselves from the realities of their activity. The contracts and settlement sheets were at their disposal and revealed both internal irregularities and contradictions between the two documents. They were on notice that Lapin had ties with Monarch as he repetitively peddled loans to them. They were thus chargeable with a heavy duty to be assured that his purported representation of the borrower was aboveboard, for he was obviously acting for two principals whose interests could well be in conflict. See Metropolitan Casualty Ins. Co. v. Potomac Builders' Supply Co., 61 App.D.C. 255, 61 F.2d 407 (1932). Given their superior knowledge of building costs and financial matters and the opportunity they had to observe and to question, plus the obvious need to inquire which the circumstances presented, they cannot rely on their self-induced ignorance to put themselves into a position of holders in due course. In short, there were many warnings of irregularity which even limited inquiry would have readily disclosed.
 
 
 35
 Jefferson and Montgomery may not in the light of these irregularities and indicia of fraud be heard to suggest that the proof as to a particular plaintiff does not put them on precise notice of misrepresentation and unconscionable dealing. All of the plaintiffs were targets of the fraud. The education, understanding, recollection and details of each borrower's dealings vary, but the pattern is overwhelmingly apparent, and had either of these associations taken appropriate precautions, under the circumstances presented they would have ceased facilitating Monarch's scheme, and none of the plaintiffs would have been serviced regardless of the particular course of their individual dealings with Monarch. * * *
 
 
 36
 This is an equitable proceeding and the Court must consider the obvious commercial realities presented by the record before it. Indeed the Uniform Commercial Code itself recognizes something more than actual notice may suffice to destroy the holder in due course defense. The Court finds the commercial realities persuasive in determining that Jefferson and Montgomery did not act in good faith, and were on notice because they "should have known." These sophisticated financial institutions were concerned solely with the sufficiency of their security. But they were not dealing with comparably sophisticated borrowers experienced in commercial matters. The borrowers, many of whom were semi-literate, had no clout. They were threatened with loss of their homes if they raised any question and went forward, sometimes with enormous sacrifice, resigned in their ignorance to pay off unjustifiable charges to keep a roof over their heads. Where lenders facilitate consumer credit financing they must be held to a high standard of inquiry to make certain their services are not being misused by unscrupulous merchandisers such as Monarch.
 
 
 37
 The District Court correctly applied the "all the facts and circumstances" test in determining the lenders' knowledge and good faith with respect to the fraud. See Blow v. Ammerman, 121 U.S.App.D.C. 351, 350 F.2d 729 (1965); Calvert Credit Corp. v. Williams, 244 A.2d 494 (D.C.App. 1965). The panel opinion of this court, reversing the District Court, does not in terms reject this standard. In my judgment, however, the panel's rejection of the District Court's findings of fact and conclusions on mixed questions of fact and law exceeds the proper limits of appellate review. See Rule 52(a), Fed.R.Civ.P. It is, of course, true that the panel opinion applies only to the particular facts developed at trial in this case, and does not foreclose even the other victims of the Monarch fraud from succeeding in suits similar to this one.[2] Nevertheless, I submit that the substantial injustice done to the 37 plaintiffs in this case, the de novo nature of the panel's review of the evidence before the District Court, and whatever possibility exists that the panel's opinion will lead to an undue broadening of the availability of the holder in due course defense warrant rehearing en banc.
 
 
 38
 Statement of McGOWAN, Circuit Judge, in Which BAZELON, Chief Judge, and J. SKELLY WRIGHT and SPOTTSWOOD W. ROBINSON, III, Circuit Judges, Join, of Reasons for Voting for Rehearing En Banc.
 
 
 39
 I join in Judge Wright's statement, believing that the panel's treatment of the findings of the District Court appears to exceed the limitations of Rule 52(a), Fed.R.Civ.P., to a degree warranting en banc examination. It seems appropriate to note, however, that the substantive law, if any, made by this court's decision in this case may well have significance only for the parties to it. This is because the central question at issue involves local, not federal, law; and as such is subject to authoritative and binding determination by the local courts of the District of Columbia.
 
 
 40
 This case was in the District Court only because the jurisdictional allocations of the D.C. Court Reorganization Act had not yet become fully effective when it was filed. Commenced today, it would have to be brought in the local courts. And, of course, even the same question arising today in a diversity case in the District Court would be governed by whatever rule is established by the local courts. The potential of this case for "undue broadening of the availability of the holder in due course defense" can thus derive only from such persuasiveness as it may have for courts not required to follow it. And that persuasiveness is surely impaired to the extent that settled and obligatory standards of appellate review of trial court findings have not been observed.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 Although some of the notes were signed prior to January 1, 1965, the effective date of the District of Columbia Uniform Commercial Code, 28 D.C.Code § 1-101 et seq., and are therefore governed by the earlier Uniform Negotiable Instruments Law, 28 D.C.Code §§ 101-1011 (1961 ed.), the result in this case is the same under either statute
 
 
 [2]
 During 1964 and 1965 Jefferson Federal made approximately 171 loans, arranged by Lapin, to customers of Monarch. During 1964 Montgomery Federal made 31 such loans
 
 
 [1]
 The burden of proof rests on one claiming to be a holder in due course. 28 D.C.Code § 3-307(3) (1973); United Securities Corp. v. Bruton, 213 A.2d 892 (D.C.App. 1965)
 
 
 [2]
 Although this suit was originally filed as a class action, certification of the class was denied by the District Court