**Robert G. WOHLRABE, et al.,
Respondents,**

v.

**Roger D. POWNELL, et al., Defendants,**

**Greeley Street Clinic, P. A., et al., Appellants.**

No. 50208.

Supreme Court of Minnesota.

June 26, 1981.

Rehearing Denied Aug. 5, 1981.

Dorsey, Windhorst, Hannaford, Whitney & Halladay, William J. Keppel and Diane D. Malfeld, Minneapolis, for appellants.

Cox & Goudy and Charles A. Cox, Minneapolis, for respondents.

Heard before OTIS, PETERSON, and TODD, JJ., and considered and decided by the court en banc.

## OPINION

TODD, Justice.

Roger D. Pownell, an accountant, had worked for Dr. Robert G. Wohlrabe both full time and part time from 1966 to 1975. Pownell also performed accounting services for the Greeley Street Clinic, P. A. and the Greeley Profit-Sharing Trust from 1972 to the fall of 1974. In the summer of 1974, Pownell apparently diverted $64,000 of the trust's funds which were to have been used to purchase a bank note. The note failed to appear during the trust's year-end audit, and Pownell came under pressure to produce the note. Instead of returning the note, Pownell borrowed funds from Dr. Wohlrabe, purchased a cashier's check in the amount of $77,875, and gave the check to the trust. The extra $13,875 apparently represented repayment of $6,000 diverted from the clinic's funds and interest payments on both diverted funds. The trial court found the loan from Wohlrabe was obtained by fraud, imposed a constructive trust on the loaned funds, and ordered the Greeley Trust and Clinic to pay the money back to Wohlrabe. We vacate in part and remand with instructions.

Pownell and Wohlrabe had a business relationship which had lasted several years. Pownell began performing accounting services for Dr. Wohlrabe in 1966 or 1967 as an employee of an accounting firm. In early 1969, Pownell went to work for Dr. Wohlrabe as an accountant and office manager and continued in that position until mid–1972. At that time, Pownell set up his own accounting firm but continued to perform accounting services for Dr. Wohlrabe, who held him in high regard. In the spring of 1974, Pownell told Dr. Wohlrabe he had an opportunity to buy a business which he could resell for a profit. Pownell asked Dr. Wohlrabe to guarantee his note in the amount of $57,000, and Dr. Wohlrabe agreed. Later that summer, Dr. Wohlrabe discovered that he had signed as maker of the note rather than as guarantor. When Dr. Wohlrabe confronted Pownell with this fact, Pownell convinced Dr. Wohlrabe that Dr. Wohlrabe had been mistaken as to their original agreement. Dr. Wohlrabe accepted this explanation.

In late 1972, Pownell's accounting firm began working for the Greeley Trust and Greeley Clinic. In 1973, Pownell asked Edward Lechner, an attorney who specializes in counseling profit-sharing trusts, to advise the Greeley Trust. In 1974, Pownell hired Terry Rawstern as an accountant for his firm, and by August of 1974, Rawstern was in charge of the accounting work done for the Greeley Clinic. At about this time, Pownell sold his accounting business for the clinic to Kenneth Johnson and Allen Anderson. Rawstern continued handling the clinic accounts for his new employers. Pownell had no contact with the accounting services rendered to the clinic or to the trust after October 1974.

Pownell apparently embezzled two checks. In the summer of 1974, the Greeley Trust had instructed Pownell to invest $64,000. Pownell reported that the funds had been invested in a note through the First National Bank of St. Paul. Apparently such an investment was never made, and the funds were diverted by Pownell to an unknown use. In September 1974, Pownell had caused a check for $6,000 to be drawn against the clinic's funds. Pownell was to have deposited the check in the clinic's account for income tax and social security obligations, but this check was also apparently diverted by Pownell.

In December 1974, Lechner, on his own initiative, began examination of the Greeley Profit-Sharing account so as to determine the amount of annual contributions to be made to the trust. In examining the records, he noted the listing of the $64,000 note as an asset, but he could not find the note itself. Lechner called Rawstern to inquire as to the physical location of the note. Rawstern told Lechner that he only handled the clinic's accounts and that Pownell should be contacted about the trust's note. When reached by phone, Pownell advised Lechner that he would send Lechner the note which he had obtained through the First National Bank of St. Paul. After about a week or 10 days, in late December

or early January, Lechner again attempted to reach Pownell regarding the note. Again Pownell said that he would get the note to Lechner, but this time Pownell also began to speak of the note as a Thorp Credit note instead of as a First National Bank note. Lechner then urged one of the clinic's doctors and Rawstern to pressure Pownell to get the note to him as he wanted to finish his work before leaving on vacation in February.

Rawstern advised his accounting firm that Lechner was having difficulty getting the note. Rawstern also advised the firm that the clinic credit manager had been sent to the Stillwater bank on January 14, 1975, to check the trust's safety deposit box for the note and that the box had been empty. This situation worried Johnson and Anderson, the owners of the accounting firm. Johnson told Rawstern that Rawstern should tell the doctors about the missing note "because they were being screwed." There is no evidence, however, as to whether Rawstern ever communicated Johnson's opinion to the doctors at the clinic. Anderson was so anxious about the missing note that he went to see Pownell on the morning of January 24 to talk to him about it. Anderson was not satisfied with Pownell's answers to his questions and called Lechner that morning and advised Lechner to take immediate action.

Initially, Lechner had not been very surprised by Pownell's delay in sending the note because he knew that accountants were very busy closing their clients' books in December and January. A few days before January 24, however, Lechner began to suspect that Pownell may have embezzled the $64,000. With Pownell's actions specifically in mind, Lechner talked about embezzlement with a friend who had worked for the F.B.I. On January 23, Lechner called Pownell's house and left a message that it was urgent that Pownell call him. Lechner then received Anderson's call. When Pownell returned Lechner's call, Lechner told him that a lot of people were pressuring him to get the note and that now he was pressuring Pownell. Lechner told Pownell that he had talked to a friend who was formerly with the F.B.I. and that he wanted a copy of the note by noon on January 24 or he had no other alternative but to think that Pownell had embezzled the money. Lechner also told Pownell that he was going to advise the doctors of his opinion of embezzlement if the note was not produced. Pownell advised Lechner that he would go to the First National Bank in St. Paul and get the note out of his safety deposit box. That was the first time Lechner had heard anything about the note being in a safety deposit box.

Lechner was out of his office at noon on January 24, but he returned at about 2:30 p. m. On his desk he found a cashier's check in the amount of $77,875, drawn by the First National Bank of St. Paul, payable to the Greeley Street Clinic, P.A. Profit-Sharing Plan. The name of the remitter did not appear on the check. Lechner testified that when he found the check he was surprised and confused and he immediately called Rawstern. Lechner told Rawstern that he could not account for the amount of the check. Lechner asked Rawstern to review his records to determine whether $64,000 was the amount given by the clinic to the trust so that a bank note could be purchased. Rawstern reviewed the records and found that the $64,000 figure was correct. He also found, however, that a $6,000 clinic check supposedly drawn to pay tax and social security obligations had been deposited in a Minneapolis bank instead of in the Stillwater bank as was normal.

Lechner testified that it appeared to him and Rawstern that Pownell had diverted $64,000 of trust funds and $6,000 of clinic funds and that the balance of the check, $7,875, represented interest. Rawstern requested that Lechner immediately deliver the check to the clinic instead of mailing it. Despite objection, Lechner agreed to do so. When he arrived at the clinic, he met with Rawstern and one of the doctors whose identity he could not recall. Lechner instructed Rawstern to deposit all but $6,000 of the check in the trust account and to deposit the $6,000 in the clinic account.

Lechner testified that Rawstern and the doctor were relieved to have their money and that his comment was that the "whole thing still stinks."

Dr. Wohlrabe testified that Pownell came into his office at about 1 p. m. on January 24. He described Pownell's condition as severely agitated, excited, and, in fact, Pownell was crying. Pownell told Dr. Wohlrabe that he had a really big problem, that he needed a large amount of money, and that he wanted Wohlrabe to help him. Pownell then explained that a representative of the Greeley Clinic, whose members were unknown to Dr. Wohlrabe, had contacted him about a $70,000 Thorpe note which he had purchased for the clinic. The representative told Pownell that if he did not show up with the note or cash within two hours, he would be reported to the county attorney. Pownell further told Dr. Wohlrabe that the note was in the safe at the clinic, but that the representative could not find it and would not let Pownell look for it. Pownell said that the doctor who usually handled these matters was on vacation and would not be back for two weeks.

Dr. Wohlrabe accepted this story without question because he did not have the slightest doubt as to Pownell's integrity despite the misunderstanding which took place the previous summer concerning the $57,000 note. Dr. Wohlrabe told Pownell that he wanted to help him but that he did not have $70,000 or more available. Pownell suggested that the funds were available in Dr. Wohlrabe's business enterprises. Dr. Wohlrabe then called in his bookkeeper, had Pownell repeat the story, and advised his bookkeeper to issue the necessary checks to Pownell. This was done, and Pownell used these funds to purchase the cashier's check he delivered to Lechner's office.

It is undisputed that Lechner and the members of the Greeley Clinic did not know that Dr. Wohlrabe was the source of the funds in the cashier's check until more than a month after the check had been deposited. It was at this time that Dr. Wohlrabe found out what Pownell had done with the $77,875 loan he had made. Dr. Wohlrabe then commenced this action against Pownell, the Greeley Street Clinic, and the Greeley Profit-Sharing Trust. Judgment was entered against Pownell by stipulation. The trial court imposed a constructive trust upon the $77,875 and entered judgment for Dr. Wohlrabe as to those funds.

We have detailed the facts in this case extensively because we adhere to the proposition that there is no rule of thumb to be automatically applied in determining whether the holder of a note holds it in due course. Each case must rest on its own facts. *Slaughter v. Jefferson Federal Savings and Loan Association*, 176 U.S.App. D.C. 49, 53, 538 F.2d 397, 401 (1976). We also detailed the evidence because we find it necessary to overturn several findings of fact of the trial court on the grounds that the findings are clearly erroneous. Minn.R. Civ.P. 52.01.

Lechner testified that he instituted the search for the $64,000 note on his own initiative. In seeking to locate the note, he called Rawstern who told him that he did not know where it was because Pownell had been responsible for securing the note. Lechner then called Pownell. The trial court found that he had been told to do so by Rawstern. To the extent that such a finding indicates that Rawstern was directing Lechner on behalf of Greeley Clinic to pursue the matter with Pownell, it is inconsistent with the evidence. In December when this conversation occurred, neither Rawstern nor any member of the Greeley Clinic had or should have had any knowledge that the note did not in fact exist.

The trial court found that after Lechner had contacted Pownell in December about the location of the note, the Greeley Clinic gave money to Pownell to be kept at the First National Bank of Stillwater for tax purposes and that Pownell had told the clinic that a note for $6,000 was in the clinic's safety deposit box at the Stillwater bank. The finding is completely without support in the record. Pownell had secured a $6,000 check which he was to deposit in the clinic's tax account at the Stillwater bank. Instead, Pownell deposited the check

in a Minneapolis bank and then diverted the money to his own use. There was no note involved, and Pownell did not tell anyone that a note was in a Stillwater bank safety deposit box. In fact, no one at the clinic even knew that the $6,000 check had been missing until Rawstern came across the check stub on January 24. Thus, the discovery by the Greeley Clinic credit manager that the Stillwater bank safety deposit box was empty is unrelated to the clinic's knowledge of Pownell's diversion of the $6,000.

The trial court found that one of the clinic doctors had called Lechner and told him to put pressure on Pownell to return the note. The evidence discloses that Lechner called the clinic and spoke to one of the doctors whose name he could not recall. Lechner asked the doctor to put some pressure on Pownell to deliver the note so that Lechner could complete his work before leaving on vacation. Dr. Jerome E. Schulz of the Greeley Clinic testified that he received a call from Lechner. Dr. Schulz stated that he understood from the phone call that Lechner wanted him to advise Pownell that it was all right to give the note to Lechner. Pownell called Dr. Schulz, and the doctor advised him that it was all right to show Lechner the note. This conversation occurred a day or two before January 24, 1975. The trial court's characterization of these events tends to indicate that the clinic was aware of and concerned over the failure of Pownell to produce the note. The evidence does not justify such an inference.

The trial court also found that Lechner had called a doctor at the clinic on January 24, 1975, after making his demand on Pownell and that Lechner had advised the doctor of his suspicions. There is no evidence that such a phone call was made.

Lastly, the trial court inferred that Dr. Wohlrabe's accountant provided a cashier's check to Pownell. In fact, the checks delivered to Pownell were drawn on Wohlrabe's business accounts. Pownell in turn used these funds to purchase a cashier's check at the First National Bank of St. Paul, which

he delivered to Lechner's office. The check was payable to the Greeley Trust but was devoid of any information indicating who the remitter was. There was no indication that Dr. Wohlrabe had any connection with its issuance.

As will be explained below, this accumulation of errors in the trial court's findings of fact precludes our acceptance of the trial court's conclusion that the cashier's check was received by the Greeley Trust in bad faith and with notice that it must have been obtained by fraud.

The issues presented are:

(1) Does Minn.Stat. § 336.3–305(1) (1980) constitute the exclusive authority for determining the rights of the Greeley Clinic and Greeley Trust?

(2) Is the Greeley Trust a holder in due course of the $77,875 cashier's check so as to take the check free of the constructive trust?

■ 1. The trial court did not apply the Minnesota codification of the Uniform Commercial Code (Minn.Stat. §§ 336.3–304 and 336.3–305 (1980)) to this dispute; instead, general principles of constructive trust law were relied upon. We hold this application of law was in error. Section 336.3–305 of our statutes is the exclusive authority for determining the rights of a holder of a negotiable instrument. Constructive trust law is only applicable to the extent it is incorporated into Article 3 of the Uniform Commercial Code (U.C.C.), a factor which is not relevant here.

Section 336.3–305 says a holder in due course (HDC) "takes the instrument free from all claims to it on the part of any person." That this language contemplates a bar to the equitable claim of constructive trust here at issue is clear from Comment 2 to the official comments of U.C.C. § 3–305:

The language "all claims to it on the part of any person" is substituted [from the original Negotiable Instruments Law (NIL) section] * * * in order to make it clear that the holder in due course takes the instrument *free not only from any claim of legal title but also from all liens,*

*equities, or claims of any other kind.*
[Emphasis added.]

The rights of one not a holder in due course, on the other hand, do not include this shield from equitable claims. Section 3–306 provides "[u]nless he has the rights of a holder in due course any person takes the instrument subject to all valid claims to it on the part of any person." Comment 5 to section 3–306 says all valid claims "include claims of legal title, lien, *constructive trust or other equity* * * *." Thus, a holder in due course is shielded in Article 3 from equitable claims of constructive trust; one not a holder in due course is not shielded. In either case, Article 3 is the exclusive source for evaluating the rights of the holder of a negotiable instrument. The difference in treatment—some holders being subject to constructive trusts while others are not—is fully intended by the U.C.C. Several courts have held a holder in due course immune from constructive trust claims. We agree. *Bowling Green Inc. N.H. v. State Street Bank & Trust Co.*, 307 F.Supp. 648, 652 (D.Mass.1969), *aff'd*, 425 F.2d 81 (1st Cir. 1970); *Nicklaus v. People's Bank & Trust Co.*, 258 F.Supp. 482, 486 (E.D.Ark. 1965).

■ 2. We must next decide whether, under the facts of this case, the Greeley Trust qualifies as a holder in due course. Under Minn.Stat. § 336.3–302(1) (1980), a holder in due course is—

[A] holder who takes the instrument

  (a) for value; and

  (b) in good faith; and

  (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person.

  (2) A payee may be holder in due course.

The Greeley Trust is a holder of the negotiable instrument here in question. Since the Greeley Trust was the payee of the negotiable instrument, it may be a holder in due course if it satisfies the remaining obligations imposed by the statute.

The first requirement, value, is satisfied in this case. The delivery of the check by Pownell was in payment of an antecedent debt; therefore, the Greeley Trust took the instrument "for value." *See* Minn.Stat. § 336.3–303(b) (1980). This is not disputed.

The second requirement, good faith, is also satisfied in this case. We have previously discussed the good faith test in Article 3 as a subjective standard rather than an objective standard. *Eldon's Super Fresh Stores v. Merrill Lynch*, 296 Minn. 130, 136, 207 N.W.2d 282, 287 (1973). It is an issue of honesty of intent rather than of diligence or negligence. Some term it the "white heart, empty head" test. It is not sufficient that there be circumstances or suspicions such as would put a careful purchaser upon inquiry. We have traditionally held that subjective good faith is simply "the honest belief that [your] conduct is rightful." *Whitney v. Huntington*, 37 Minn. 197, 33 N.W. 561 (1887). Thus, rarely will suspicious circumstances alone undermine a claim that a negotiable instrument was taken in good faith. Here, the clinic claims it did not suspect the cashier's check was bad, nor did it realize the $77,875 had actually come from Dr. Wohlrabe, who had a claim of fraud against Pownell. Nothing in the trial court's findings indicates it disbelieved these claims of good faith by the clinic. Yet, with a subjective intent standard, such claims carry great weight. Even embezzlers can have funds from honest sources which they use once their embezzlement has been discovered. As long as the clinic believed Pownell was making good on the missing money by substituting legitimate funds, the subjective good faith test of Article 3 is satisfied.

The third requirement in the HDC doctrine is that a holder be without notice of a defense or claim. We hold this element is also satisfied in the facts before us. Under section 336.1–201(25), "A person has 'notice' of a fact when * * * from all the facts and circumstances known to him at the time in question he has reason to know that it exists." Minn.Stat. § 336.1–201(25) (1980). Notice is not limited to facts actually known; it exists where a "fact in question

is inferable." S. Kinyon, 21A Minn.Stat. Ann. 76, Minnesota Code Comments (1966). We said in 1973:

> Fact or circumstances from which a purchaser could infer that a claim exists on the part of any person are referred to in Minnesota as "danger signals" and knowledge of such facts is the "red light" test. * * * In applying the test, this court has rather consistently held that having notice by way of the "inferable knowledge" test is something more than failure to make inquiry about an unknown fact. Failure to make such inquiry may be negligence and lack of diligence, but it is not "notice" of what he might discover.

*Eldon's Super Fresh Stores v. Merrill Lynch*, 296 Minn. 130, 138, 207 N.W.2d 282, 288 (1973).

3. In this case, the trial court found that the Greeley Trust had knowledge that the cashier's check "must have been obtained by fraud." Greeley Trust disputes the findings and cites to several cases, including *Eldon's Super Fresh Stores*, in support of its position. Dr. Wohlrabe believes that the trial court's findings were correct and cites to several cases, including *Eldon's .Super Fresh Stores*, in support of his position. We reaffirm that *Eldon's Super Fresh Stores* sets out the appropriate test to be applied where the issue of notice arises in a commercial paper transaction.

As applied to this case, the test is: did a "red light" shine when the Greeley Trust took the cashier's check from Pownell? The trust contends that there was no red light. Although Lechner suspected that Pownell had been misusing the trust's funds, there was nothing about the face of the check or the surrounding circumstances which should have put Lechner on notice that the funds were fraudulently obtained by Pownell. Admittedly, the note had become cash, and there was an extra amount of money for which Lechner was completely unable to account. However, that extra money could have come from many honest sources and could have represented Pownell's attempt to make amends for misusing the note. Lechner had good reason to suspect that Pownell had attempted to defraud the trust and the clinic, but no reason to suspect that Pownell had drfrauded others in order to repay them.

Dr. Wohlrabe contends that the circumstances surrounding presentation of the check constitute a shining red light. For weeks Lechner had tried to get Pownell to deliver a $64,000 note. Finally, on January 24, Lechner became so bothered by the delay that he demanded delivery by noon that day. Pownell delivered to Lechner a cashier's check for $77,875 within this deadline. Lechner was surprised to see a check for such a large amount of money instead of a $64,000 note. Dr. Wohlrabe contends that when Lechner found out that the additional money represented repayment of another diverted fund of $6,000 as well as some type of interest payment, Lechner should have inferred that Pownell had obtained the money for the check by fraud or at least have called the bank or Pownell to find out where the money came from.[1]

Under the circumstances of this case, we find no red light. For several reasons, the trust was not on notice that Pownell had obtained the cashier's check by fraud. First, there was nothing on the face of the check which warned of the fraud. Section 3–304 lists several defects which may constitute notice of a claim or defense; none of these warnings are associated with the check in this case. Minn.Stat. § 336.3–304 (1980).

Second, the trial court's findings of fact, once amended to conform with the record, reveal no danger signal sufficient to warn the clinic of an impending fraud. Other

---

1. Dr. Wohlrabe argues that $7,875 is clearly excessive interest on the diverted funds. While we acknowledge that the amount is probably excessive for notes held less than 6 months, we place no special import on that fact. Pownell may have just miscalculated the interest, or he may have given extra "interest" in order to soothe the clinic members' feelings toward him so that they would not seek his arrest. Thus, the simple fact that the interest was excessive does not indicate that the funds for the check had been obtained by fraud.

than the clinic attorney who, on his own initiative, was pressing Pownell to find the misplaced $64,000 note, no one at the clinic knew or had any reason to suspect that an embezzlement had taken place.

Third, Pownell's generally suspicious behavior does not provide strong enough evidence here of an invalid instrument. The only suspicious circumstances available simply lead to the inference that an embezzlement from Greeley had occurred. It is an inference upon an inference to conclude that, in order to replace the embezzled funds, a second fraud had also taken place. Yet only the second fraud affects the validity of the instrument. While some courts have been willing to hold that general knowledge of a payee's questionable business practices precludes holder in due course status, no court seems willing to rely exclusively on such knowledge to find a purchaser has notice of a claim or defense. J. White & R. Summers, Uniform Commercial Code 567 (2d ed. 1980). Thus, in *Universal CIT Credit Corp. v. Ingel*, 347 Mass. 119, 196 N.E.2d 847 (1964), suspicious circumstances surrounding the prior dealings of an aluminum siding salesman did not constitute notice to the bank that the negotiable instrument involved was invalid. In *Waterbury Savings Bank v. Jaroszewski*, 4 Conn.Cir. 620, 238 A.2d 446 (1967), suspicions about the veracity and credit standing of a subcontractor were insufficient to deprive the purchaser of holder in due course status. No circumstances in this case tend to indict the validity of the negotiable instrument involved. Thus, the evidence of notice is at best very weak.[2]

We do not reach, however, the question of whether this notice, weak as it is, destroys holder in due course status. Our holding relies primarily upon the presence of a cashier's check in this transaction and the "safety signals" which such checks carry for the commercial market place. A cashier's check, drawn on a bank's own funds, is considered a highly negotiable instrument and represents an assurance of good faith dealing by the offeror.

> In the commercial world a cashier's check is used for a variety of purposes. Often the purchaser does not have a checking account at the bank and needs a readily negotiable instrument. The purchaser may wish to assure a creditor of his good faith and thus he relies on the cashier's check of the bank to help accomplish this goal.

4 New Mexico L.Rev. 253, 258 (1974) (footnote omitted). Facts sufficient to constitute a shining red light, under such circumstances, must be substantial if we are to avoid destroying the utility of the cashier's check altogether. It is an assurance of negotiability tantamount to a cash transfer which a cashier's check represents. If we are to begin requiring parties to investigate, despite this representation of negotiability, we are subverting the purpose for which the cashier's check was proffered.

That Pownell in these circumstances was a bad risk on his personal credit and had engaged in some questionable business practices is not particularly alarming. On the contrary, this is typical of settings where cashiers' checks are offered by one party to allay the fears of the other. For this reason, we find evidence of notice insufficient.

Nor does Dr. Wohlrabe's relative innocence in this fraud change our decision. In *Eldon's Super Fresh Store v. Merrill Lynch*, 296 Minn. 130, 139-40, 207 N.W.2d 282, 289 (1973), this court stated:

> what it knew, the trust could have inferred that Pownell had misused the $64,000 note and the $6,000 deposit. The trust could not, however, have inferred that Pownell was short of cash, was unable to return the misused money, and would be forced to embezzle from others to repay the money. Thus, the trust was without notice of a claim of fraud against the cashier's check and was a holder in due course of the check.

---

2. In this respect, the instant case differs significantly from the factual situation in *Fortier v. McRae*, 190 Minn. 571, 252 N.W. 833 (1934), where, in a pre-Code case, we found that notice existed. In *Fortier*, the person in the trust's position knew that the person in Pownell's position was having financial difficulties and that he was preparing to be prosecuted for embezzlement. In this case, the trust did not know that Pownell was having financial difficulties because of his past embezzlements. From

Courts are often confronted with the obligation of applying rules to determine which of two relatively innocent persons must suffer a loss due to misconduct of a third person. The instant case is such a situation. The Minnesota cases dealing with situations such as the one at bar have indicated that the loss must fall on the drawer rather than upon the payee (or other holder) because it was the drawer who created the situation and opportunity for defalcation by its agents. *Jeanette Frocks, Inc. v. First Produce State Bank* [272 Minn. 234, 137 N.W.2d 205 (1965)]. Accord, *Drumm Const. Co. v. Forbes*, 305 Ill. 303, 137 N.E. 225 (1922). *Eldon's* did intend in fact to have the check delivered to Merrill Lynch.

In this case, Dr. Wohlrabe intended that the funds be delivered to the trust. He is the drawer. There was no information available or inferable which prevents the trust from being a holder in due course. The fact that the trust benefits from Dr. Wohlrabe's loss is not a sufficient reason for destroying the negotiability of the instrument here involved.

The judgment for the plaintiffs is vacated as to the defendants Greeley Street Clinic, P.A. and the Greeley Profit-Sharing Trust, and the matter is remanded to the district court with instructions to enter judgment for the Greeley defendants, Greeley Street Clinic, P.A. and the Greeley Profit-Sharing Trust.

OTIS, Justice (dissenting).

I do not take issue with any proposition of law cited by the majority governing the Uniform Commercial Code. The narrow question is one of fact, namely, does the evidence support the trial court's finding that the Greeley profit-sharing trust received a cashier's check from Roger Pownell for $77,875 with knowledge of facts which imposed on the trust a duty to make further inquiry which would have disclosed that the check was fraudulently obtained by Pownell, giving rise to a constructive trust in Wohlrabe's favor.

In my opinion, this is simply a matter of according the trial court appropriate deference in resolving conflicts in the testimony and in drawing inferences from circumstantial evidence. I would affirm.

Minn.Stat. 336.3–302(1) (1980) provides as follows:

(1) A holder in due course is a holder who takes the instrument

(a) for value; and

(b) in good faith; and

(c) without notice * * * of * * * claim to it on the part of any person.

I have no quarrel with the majority's view that the antecedent debt of Pownell to the Greeley Trust satisfied the requirements of "value." Our cases so hold. Nor is there any issue in this case concerning the establishment of "good faith" as that word is used in the UCC. The trial court did not mention or rely on either of these statutory criteria as grounds for imposing the constructive trust. Succinctly stated it held "The cashier's check was received with knowledge that something was wrong and with notice that it must have been obtained by fraud." In my opinion, there was ample evidence to support that finding.

"Notice" is defined in Minn.Stat. § 336.1–201(25)(c) (1980) as follows: "A person has 'notice' of a fact when * * * (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists."

The Minnesota Code Comments discussing "notice" as set forth in Minn.Stat. § 336.1–201(25)(c) (1980) state that notice consists among other things of "knowledge of facts from which the fact in question is inferable * * *." Kinyon, *Minnesota Code Comments*, in Minn.Stat.Ann. § 336.1–201(25), at 76 (West 1966). In discussing Minn.Stat. § 336.3–304 (1980) the Comments state:

In this and other sections in the UCC the term 'notice' means either that a party has actual knowledge of a fact * * * or 'has reason to know' of it—i. e. has actual knowledge of facts from which he can *infer* the probable existence of the fact in question. * * * [W]here a pur-

chaser has knowledge of facts indicating that something is probably wrong, he can be held to have notice even though he does not investigate and determine the exact nature of the irregularity.

Kinyon, *Minnesota Code Comments*, in Minn.Stat.Ann. § 336–3–304, at 232 (West 1966) (emphasis in original).

This is such a case, and in my opinion, meets all the requirements for imposing a constructive trust. It should be borne in mind that the section 336.3–305 insulates a negotiable instrument from the claims of third persons only when taken by a holder in due course, that is to say, one who takes without notice.

Whether the Greeley Trust had notice within the meaning of the statute, and if so, what remedy is appropriate, depend largely on the same set of circumstances and inferences. The facts here are unlike those in *Eldon's Super Fresh Stores v. Merrill Lynch*, 296 Minn. 130, 207 N.W.2d 282 (1973), where Drexler, a lawyer, converted a check drawn by a third party, payable to a brokerage firm, by purchasing stock in his own name. There the brokers had no previous knowledge which suggested in any way the possibility of wrongdoing by the attorney, and we held that the mere fact the check was drawn by a third party did not put the brokers on notice of that party's rights.

That there is ample precedent for the trial court to exercise its equitable powers in these circumstances is clear from our prior decisions. In *Fortier v. McRae*, 190 Minn. 571, 252 N.W. 833 (1934) one Simons purchased a note, knowing that the assignor McRae had embezzled money from a bank and was trying to make restitution, but not knowing that the note was held in trust. The trial court found that "this together with all other facts and circumstances as disclosed by the evidence in this case were sufficient to constitute red lights ahead and to cast upon the defendant Edwin J. Simons the duty to make inquiries * * *." *Id.* at 573, 252 N.W. at 834. With respect to those findings we said:

These circumstances should have put Simons upon inquiry, and inquiry would have revealed the trust. The neglect to make inquiry under the circumstances was more than mere negligence. It was a lack of commercial good faith. The knowledge which he had was sufficient to prevent the acquisition of the paper by commercially honest men without further inquiry.

*Id.*

In support of our conclusion that the purchaser was on notice, we quoted from *King Cattle Co. v. Joseph*, 158 Minn. 481, 488, 198 N.W. 798, 800 (1924), where we had observed: "Men of business experience know that hard-pressed debtors turn sharp corners and are not scrupulous to distinguish between their own and the property of others entrusted to their keeping."

In *Fortier* we approved a rule that it was not necessary to show that the person under investigation knew the exact fraud that was practiced "it being sufficient to show that he had notice that there was something wrong about his assignor's acquisition of title, although he did not have notice of the particular wrong that was committed." *Fortier v. McRae*, 190 Minn. 571, 252 N.W. 833, 834 (1934). Finally, we noted that knowledge of the exact truth is not necessary "but knowledge of some truth that would prevent action by those commercially honest men for whom law is made." *Id.* The *Fortier* case turned on a finding of bad faith but the principles we there enunciated apply with equal force to the issue of notice.[1]

In the summer of 1974 Roger Pownell, an accountant for the Greeley Clinic and Greeley Trust, diverted to his own use $64,000 of trust funds received by him for the purchase of a note from the First National Bank of St. Paul. In September 1974, he embezzled $6,000 which was intended for the payment of Clinic taxes.

In December 1974 and again in early January 1975 Edward Lechner, acting as attorney for the Greeley account, asked Pownell

---

1. See also *Shaffer v. Brooklyn Park Garden Apts.*, 311 Minn. 452, 250 N.W.2d 172 (1977).

for the $64,000 note. Pownell stalled for time and gave only evasive answers. This was the first "red light." At that time Pownell referred to a Thorp Credit Note not a First National Bank Note, a second "red light."

Terry Rawstern, in charge of accounting for the Greeley Clinic, discovered that the Clinic credit manager, on January 14, 1975, had found the trust safety deposit box empty, a third "red light."

Some days before January 24, Lechner suspected embezzlement by Pownell and discussed it with a friend in the FBI office, a fourth "red light."

On the morning of January 24, one of Rawstern's employers, Allen Anderson, whose partner had told Rawstern the doctors were "being screwed," told Lechner he was not satisfied with Pownell's answers and advised Lechner to take immediate action, a fifth "red light."

On January 24, Lechner told Pownell he had talked to an FBI friend and if Pownell did not produce the note by noon he would advise the doctors that, in his opinion, there had been an embezzlement, a sixth "red light."

At 2:30 p. m. on January 24, Lechner received from Pownell, not the missing $64,000 note but a check for $77,785, without any explanation for the discrepancies in the kind of security or the amount of payment, the seventh and eighth "red lights."

So clear were these signals that Lechner, the Clinic's attorney, was not convinced that Pownell had diverted the $70,000 and Rawstern was prompted to take the extraordinary precaution of insisting that Lechner immediately deliver the check to the Clinic by hand rather than by mail. On presenting the check to a doctor at the Clinic, Lechner stated "the whole thing stinks and we have to find out what really happened."

Although appellants argue that the Clinic had a right to assume Pownell obtained the $77,875 from legitimate sources, Rawstern, their accountant, and Lechner, their lawyer, were too sophisticated and knowledgeable to rely on that assumption.

If Pownell had had assets of his own or sources of credit sufficient to cover the $70,000 embezzlement, it is hardly conceivable that he would have delayed making restitution until threatened with prosecution. Indeed had he resources of his own, it is unlikely that a professional person in his position would have misappropriated $70,000 in the first place.

Justice Matson summarized two elements of a constructive trust in a scholarly opinion which needs little explication or expansion, *Knox v. Knox*, 222 Minn. 477, 481, 25 N.W.2d 225, 228 (1946):

It is an unjust-enrichment, rectifying remedy and has nothing in common with an express trust except a confusing similarity in surname or label. In order to arise, fraud, in its true sense, need not even be present. Certain courts and text writers have added to the confusion by using the word "fraud" in such an unjustifiably broad and ambiguous manner as to include all conduct which equity treats as unfair, unconscionable, and unjust. 3 Bogert, Trusts and Trustees, Part 1 (1946 Ed.) § 471. It should be noted that it is not even necessary that a fiduciary relation should exist. 25 Minn.L.Rev. 667, 689. It is not the product of the intent of the parties. The nature of a constructive trust can best be comprehended by keeping clearly in mind that it is not, in its true sense, a trust at all, but purely a creation of equity designed to provide a remedy for the prevention of unjust enrichment where a person holding property is under a duty to convey it to another to whom it justly belongs. 23 Minn.L. Rev. 706, 708; 54 Am.Jur., Trusts, §§ 218, 219; 1 Perry, Trusts and Trustees, 7 Ed. § 166. A court of equity, in decreeing a constructive trust, is bound by no unyielding formula, but is free to effect justice according to the equities peculiar to each transaction wherever a failure to perform a duty to convey would result in unjust enrichment. 3 Bogert, Trusts and Trustees, Part 1 (1946 Ed.) § 471.

For the reasons stated, the trial court as the trier of the facts was fully justified in finding that the cashiers check was received "with notice that it must have been obtained by fraud." Consequently, respondent's right to a constructive trust is not barred by section 336.3–305(1). To be a holder in due course, entitled to invoke the statute, the recipient must take "without notice * * of * * * any claim to it on the part of any person." Minn.Stat. § 336.3–302(1)(c) (1980).

The equities weigh heavily in favor of Wohlrabe. It was the Greeley Clinic which set in motion the chain of events resulting in Pownell's embezzlement and fraud. They gave him carte blanche authority to invest their money without any effective accounting or supervision. It was not Wohlrabe, but Greeley's accountant and attorney who were convinced that Pownell had embezzled the $70,000 prior to the delivery of the cashiers check. More important the question was not which of two innocent victims should suffer the loss by the acceptance of the check. Greeley had already been victimized, and parted with nothing in return for receiving the check. For Greeley to retain Wohlrabe's $77,875 without having changed its position or suffered any prejudice in reliance on it is, in my opinion, a classic case of unjust enrichment. As in *Fortier*, the failure to make inquiry was a "lack of commercial good faith."

In short, it was Wohlrabe's fraudulently obtained $77,875 which Greeley was given; that sum was directly traceable to Wohlrabe; Greeley's attorney and accountant knew Pownell was an embezzler by his inability to produce the two notes; and those who were acting for Greeley had only to demand that Pownell disclose the source of the restitution to determine that it was fraudulently obtained.

By reversing the trial court I respectfully suggest we unwittingly encourage standards of integrity which are unworthy of both the legal and medical professions. I would affirm.

SHERAN, Chief Justice (dissenting).

I join in the dissent of Mr. Justice OTIS.

AMDAHL, Justice (dissenting).

I join in the dissent of Mr. Justice OTIS.