## ELDON'S SUPER FRESH STORES, INC. v. MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED.
## WILLIAM DREXLER, THIRD-PARTY DEFENDANT.

207 N. W. 2d 282.

April 27, 1973—No. 43682.

*William J. Nierengarten,* for appellant.

*Doherty, Rumble & Butler, Frank Claybourne,* and *Bruce E. Hanson,* for respondent.

Heard before Knutson, C. J., and Otis, Rogosheske, and Olson, JJ.

O. RUSSELL OLSON, JUSTICE.*

Plaintiff, drawer of a check payable to defendant Merrill Lynch, Pierce, Fenner & Smith, Inc., appeals from a summary judgment entered in favor of defendant. The appeal raises the issue of whether the payee was, as a matter of law, a holder in due course and thus not subject to the drawer's claim that the check, possession of which it gave to its agent, was wrongfully delivered to defendant-payee in payment of the agent's own personal obligation to defendant rather than for the benefit of plaintiff-drawer.

Eldon's Super Fresh Stores, Inc. (hereafter Eldon's) is a closely held corporation headquartered in Faribault, Minnesota, and engaged in the retail grocery business. Merrill Lynch, Pierce, Fenner & Smith, Inc. (hereafter Merrill Lynch) is a national stock brokerage firm with offices in St. Paul, Minnesota. William E. Drexler was the attorney for and corporate secretary of Eldon's and the personal attorney of Eldon Prinzing, the corporation's president and sole shareholder.

---

*Acting as Justice of the Supreme Court by appointment pursuant to Minn. Const. art. 6, § 2, and Minn. St. 2.724, subd. 2.

The relevant facts are not in dispute. From January 1968 through January 1970, Drexler maintained a trading account in his name with Merrill Lynch by which he purchased and sold stock at various times. Eldon's, on the other hand, maintained no trading account with Merrill Lynch at any time relevant herein. On August 12, 1969, Drexler purchased 100 shares of Clark Oil & Refining Company stock through his stockbroker at Merrill Lynch for $41.50 per share. A confirmation statement was mailed to Drexler by the stockbroker, and Drexler then mailed the $4,150 check here involved, together with the confirmation statement, to Merrill Lynch in payment for the stock purchase. The check was drawn by the corporation, Eldon's Super Fresh Stores, Inc., on the Security National Bank and Trust Company of Faribault, Minnesota, and contained corporate identification as follows:

"ELDON'S SUPER-FRESH STORES, INC.

FAMOUS FOR

FRESH FRUITS & VEGETABLES

DBA PRINZING'S MARKETS

[PHONE AND AREA CODE NUMBERS]

FARIBAULT, MINNESOTA"

The check, in the exact amount of the purchase price of the 100 shares of stock (not including commission charge of $39.75) and payable to Merrill Lynch, was dated August 12, 1969, and signed for the corporation by E. C. Prinzing, its president. The check contained no other designation or directive as to its use. On August 15, 1969, Merrill Lynch accepted the check in payment of Drexler's stock purchase, treating Drexler as the remitter. Pursuant to its customary practice with Drexler, Merrill Lynch retained custody of the Clark Oil & Refining Company stock certificate together with five other stock certificates previously purchased for him embodying shares in various other corporations. Five of the six stock certificates were ultimately delivered to Drexler in November 1969. There was no communication between Drexler and Merrill Lynch except the stock purchase order

for Drexler's personal account on August 12, the mailing of the confirmation statement to Drexler, and the receipt by Merrill Lynch on August 15 of the check and confirmation statement. Drexler sold the stock to his brother in December 1970. Drexler was in 1969 an attorney duly licensed to practice law in Minnesota although he has since that date been disbarred. There was no communication between Eldon's and Merrill Lynch until November 1970, 15 months after the issuance of the check, at which time Eldon's inquired of Merrill Lynch relative to the stock certificate and asserted a claim to its ownership.

Additional facts bearing on the claim of Eldon's, but not material to the determination of whether Merrill Lynch was a holder in due course, reveal a dispute between Eldon's and Drexler as to whether the check was delivered to Drexler in payment of legal services or whether it was delivered by Eldon Prinzing to Drexler as agent of Eldon's to purchase the corporate stock for Eldon's. The resolution of that issue is not before the court on this appeal. The record establishes that Merrill Lynch had no knowledge of that dispute and assumed that Drexler had received the check as remitter to use for his own purpose in paying for stock. If he did not have such right, then Merrill Lynch is subject to plaintiff's claim unless it took as a holder in due course.

The narrow issue, therefore, is whether under the recited factual circumstances Merrill Lynch, as payee of the check, was a holder in due course. Since defendant, as payee, took as a holder and obviously took for full value, decision turns on whether the payee, which received the check from the drawer's agent who in turn had received possession with the drawer's consent, took it "without notice * * * of any defense against or claim to it on the part of any person," Minn. St. 336.3—302(1)(c), and thus became a holder in due course free of any claim of the drawer that the delivery to the payee was wrongful.

The trial court succinctly characterized Eldon's' claims as follows:

"The thrust of Plaintiff's argument is that the third-party check itself was 'notice' to Merrill Lynch; that Merrill Lynch should have contacted Plaintiff upon receipt of the check and made a full inquiry as to the agreements or understandings between Plaintiff and Drexler, and that Merrill Lynch had no right to assume that Drexler was acting properly."

The law governing checks is now codified in Article 3 of the Uniform Commercial Code (hereafter U.C.C.), Minn. St. 336.3—101 to .3—805. Article 3 is entitled "Commercial Paper" and is the successor to the Uniform Negotiable Instruments Law (N.I.L.) Minn. St. 1961, §§ 335.01 to —.80. By § 336.3—102(1)(e) the word "instrument" for purposes of Article 3 means "negotiable instrument" as defined in § 336.3—104. That section embodies the traditional requirements for negotiable checks, drafts, and notes.

Section 336.3—102(1)(a) defines "issue" as "the first delivery of an instrument to a holder or a remitter." Section 336.1—201(20), which contains general definitions for the U.C.C., defines "holder" as "a person who is in possession of * * * an instrument * * * drawn, issued or endorsed to him or to his order or to bearer or in blank." The facts in this case are undisputed that Eldon's, the drawer of the check, placed the check in the hands of its agent, Drexler, for the purpose of delivery to the payee, Merrill Lynch.

It follows from those facts and those two code definitions (while somewhat circular) of "issue" and "holder" that Merrill Lynch was a holder of the instrument. We are not concerned in this case with the additional question of whether Drexler was a "holder" such that the delivery of the instrument by him to the payee, Merrill Lynch, constituted a "negotiation" which in return would bring into play the provisions of § 336.3—304(2) and (4)(e) and § 336.3—202(1). For the purposes of this case then, we treat the instrument as "issued" to Merrill Lynch, the payee

and the holder (without deciding whether there was a negotiation of the check to the payee).[1]

We next consider the requirements for a "holder" to become a "holder in due course" (hereafter HDC).

Minn. St. 336.3—302 sets out the requirements for being a HDC of negotiable instruments as follows:

"(1)   A holder in due course is a holder who takes the instrument

    (a)   for value; and

    (b)   in good faith; and

    (c)   *without notice* that it is overdue or has been dishonored or *of any defense against or claim to it on the part of any person.*

"(2)   A payee may be a holder in due course." (Italics supplied.)

The U.C.C. has thus made it clear that a payee may be a HDC. § 336.3—302(2).[2] A payee who fulfills the requirements of § 336.3—302(1) acquires the rights of a HDC as set forth in § 336.3—305 with respect to the unknown claims or defenses of parties with whom he has not dealt even though he has become a holder as payee by delivery from a remitter or the drawer's

---

[1] "Negotiation" is defined, however, in Minn. St. 336.3—202(1) as "the transfer of an instrument in such form that the transferee becomes a holder." Then follow immediately two statements descriptive of negotiation: "If the instrument is payable to order it is negotiated by delivery with any necessary endorsement; if payable to bearer it is negotiated by delivery." Neither one of those situations fits the exact factual situation in the instant case.

[2] The Uniform Commercial Code Comment No. 2e to Minn. St. 336.3—302(2), 21B M.S.A. 197, specifically notes that a payee is a holder in due course in the following instance:

"D draws a check payable to P and gives it to his agent to be delivered to P in payment of D's debt. The agent delivers it to P, who takes it in good faith and without notice in payment of the agent's debt to P. But as to this case see Section 3—304(2), which may apply." (Section 3—304(2) makes an exception where the purchaser has notice that the fiduciary is breaching his duty.)

agent rather than by negotiation from a prior holder. This was not clear under the N.I.L., and there were conflicting decisions on the point. However, precode Minnesota case law clearly established that a payee could be a HDC under the N.I.L. See, Western Surety Co. v. Friederichs, 241 Minn. 492, 63 N. W. 2d 565 (1954).

The first requirement of a HDC, taking "for value," is now codified in Minn. St. 336.3—303. The parties concede it is not in issue in this case.

The second requirement, the element of "good faith," is now defined in Minn. St. 336.1—201(19) as follows:

" 'Good faith' means honesty in fact in the conduct or transaction concerned."

In Minnesota Code Comment to § 336.1—201(19), 21A M.S.A. 75, Professor Stanley V. Kinyon indicates this good-faith test is a subjective rather than an objective test. The test requires honesty of intent rather than absence of circumstances which would put an ordinarily prudent holder on inquiry in order to constitute good faith. Cf. Jeanette Frocks, Inc. v. First Produce State Bank, 272 Minn. 234, 137 N. W. 2d 205 (1965); Pennington County Bank v. First State Bank, 110 Minn. 263, 125 N. W. 119 (1910). In short, it is an issue of honesty of intent rather than of diligence or negligence. Some term it the "white heart" test. In the instant case, the payee qualifies without question as a holder taking "in good faith."

It is the third and critical requirement—taking "without notice * * * of any defense against or claim to it on the part of any person"—with which we must deal.

The holder of an instrument has the burden of proving that he is a HDC when defenses or claims are shown. Minn. St. 336.3—307(3). See, also, Chamberlin v. Twin Ports Development Co. 195 Minn. 58, 261 N. W. 577 (1935).

"Notice" is defined in § 336.1—201(25) as follows:

"A person has 'notice' of a fact when

    (a)    he has *actual knowledge* of it; or

    (b)    he has received a notice or notification of it; or

    (c)    from all the facts and circumstances known to him at the time in question he has *reason to know* that it exists.

A person 'knows' or has 'knowledge' of a fact when he has actual knowledge of it." (Italics supplied.)

The Minnesota Code Comment to Minn. St. 336.1—201(25), 21A M.S.A. 76, points out that "notice" (as with "notice" in other recited uniform acts) is restricted—

"* * * to actual knowledge of the fact, receipt of notification of it, or knowledge of facts from which the fact in question is inferable; and they all exclude the situation in which a person does not have actual or inferable knowledge but merely *could discover* the fact by reasonable investigation. In the latter situation it is sometimes said that when a person has a duty to another to investigate a matter he has 'notice' of what he could have discovered, but the U.C.C. does not employ 'notice' in that sense under this definition except in the case covered by paragraph (b) where one has *received notification* but may not have read or understood it."

The knowledge which a person has that constitutes "notice" according to § 336.1—201(25) could, then, be termed "inferable" knowledge.

In addition to Minn. St. 336.1—201(25), § 336.3—304 describes circumstances which do and do not constitute notice for the purpose of being a HDC. Paragraphs (2) and (4)(e) of § 336.3—304, which refer specifically to a fiduciary, speak in terms of "negotiating" whereas in the instant case we treat the instrument as "issued" to the payee without reaching the question of negotiation. However, the law on "notice"—actual or inferable—is precisely the same whether the instrument is issued to a holder or negotiated to a holder. Therefore, the Minnesota

Code Comment to § 336.3—304, 21B M.S.A. 231, is pertinent. The comments to paragraphs (2) and (4)(e) make clear that the test of "notice" is the existence of actual knowledge of a fact or of facts from which one can infer the fact in question. Under the "notice" test, the question then becomes: (a) Did Merrill Lynch have actual knowledge of Eldon's claim, or (b) did Merrill Lynch have "inferable knowledge" of the claim, i.e., did Merrill Lynch have actual knowledge of facts from which it could reasonably infer the probable existence of the drawer's claim?

Facts or circumstances from which a purchaser could infer that a claim exists on the part of any person are referred to in Minnesota as "danger signals" and knowledge of such facts is the "red light" test. Sometimes the cases speak in terms of "good faith," but they concern "notice" and they are applicable to the "notice" question under the U.C.C. rather than "good faith." We have in Minnesota several cases applying this test to facts similar to the case at hand. In applying the test, this court has rather consistently held that having notice by way of the "inferable knowledge" test is something more than failure to make inquiry about an unknown fact. Failure to make such inquiry may be negligence and lack of diligence, but it is not "notice" of what he might discover. Jeanette Frocks, Inc. v. First Produce State Bank, *supra*. See, also, Western Surety Co. v. Friederichs, *supra;* Olsen v. Hoffmann, 175 Minn. 287, 221 N. W. 10 (1928).

In Western Surety Co. v. Friederichs, *supra,* an embezzling fiduciary, using funds of a school district, bought a cashier's check payable to his personal creditor and remitted it in payment of his personal debt. The cashier's check contained the notation on its face "Dist. No. 14, Remitter." The court held the debtor-payee did not have knowledge of the use of fiduciary funds. The court noted that unless a person was particularly acquainted with the procedure of handling school funds, the words "Dist. No. 14" would be meaningless.

Applying the "inferable knowledge" test to the instant case, this court concludes that Merrill Lynch did not have "notice of

any claim of the drawer, Eldon's, simply by virtue of its receipt of the check and confirmation notice from Drexler. The fact that Merrill Lynch was the named payee on the check drawn by Eldon's did not in and of itself constitute "notice" that Drexler was using the check improperly. Significantly, there were no other identification or designation marks on the check to indicate or give notice that it was drawn in payment for stock for Eldon's. Furthermore, and equally as significant, Eldon's had no account with Merrill Lynch. The designation on the check that the corporate maker was doing business as Prinzing's Markets is not by itself sufficient to constitute such "notice." Merrill Lynch was entitled to conclude that Drexler, known to be an attorney, had lawfully obtained and was delivering the instrument to discharge the debt incurred by his own stock purchase. Merrill Lynch was not required to surmise that the check, rather than being a payment for Drexler's legal services, was being misused.

There is a case in Minnesota which may appear contrary to the decision in the instant case. In Bjorgo v. First Nat. Bank of Emmons, 127 Minn. 105, 149 N. W. 3 (1914), reheard under the same name after a second trial in 132 Minn. 273, 156 N. W. 277 (1916), a land developer, Haugan, presented for payment to the Emmons bank a bank draft drawn by an Iowa bank on a Chicago bank; the Emmons bank was the payee of the draft. The holding as stated by the court was that the fact the draft was payable to the bank rather than to the individual claiming ownership "was so out of the ordinary mode of doing business" as to place a duty on the bank to inquire. 127 Minn. 109, 149 N. W. 5. The bank, however, extrinsically had knowledge of representations by Haugan that the monies would be deposited in the bank pending the exercise of certain land options by Haugan. The holding as stated in the case is actually overbroad since the recited extrinsic circumstance constitutes a basis for application of the inferable knowledge test.

Courts are often confronted with the obligation of applying rules to determine which of two relatively innocent persons must

suffer a loss due to misconduct of a third person. The instant case is such a situation. The Minnesota cases dealing with situations such as the one at bar have indicated that the loss must fall on the drawer rather than upon the payee (or other holder) because it was the drawer who created the situation and opportunity for defalcation by its agents. Jeanette Frocks, Inc. v. First Produce State Bank, *supra*. Accord, Drumm Const. Co. v. Forbes, 305 Ill. 303, 137 N. E. 225 (1922). Eldon's did intend in fact to have the check delivered to Merrill Lynch.

Under the circumstance of this case, namely, where (1) a bank check was delivered to the payee by the drawer's agent with the drawer's consent and knowledge, (2) the check itself contained no restrictions or designations as to its use, and (3) the payee, a stock brokerage firm, had no trading account with, or indebtedness to, the drawer, we hold that the payee took the check without notice of the drawer's claims. Thus, the payee became a holder in due course of the instrument.

This court is not deciding in this case whether, as between Drexler and Eldon's, Drexler was authorized to deliver the check to Merrill Lynch in payment of his personal stock purchase.

Lastly, plaintiff claims a cause of action against the holder, Merrill Lynch, on the basis of common-law negligence. There is no basis for such an action. Minn. St. 336.3—305 provides in part:

"To the extent that a holder is a holder in due course he takes the instrument free from

"(1)   all claims to it on the part of any person."

The statute provides an exclusive remedy.

Affirmed.