TOWN & COUNTRY STATE BANK OF NEWPORT, Appellant, (C2–82–1574) Plaintiff (C8–83–861),

v.

FIRST STATE BANK OF ST. PAUL, defendant and third party plaintiff, Respondent,

v.

HERITAGE STATE BANK, third party defendant, Appellant (C8–83–861).

Richard G. Frietag et al., Third Party Defendants.

Nos. C2–82–1574, C8–83–861.

Supreme Court of Minnesota.

Nov. 21, 1984.

Rehearing Denied Jan. 4, 1985.

388

Robert R. Weinstine, Darron C. Knutson, St. Paul, for Town & Country State Bank of Newport.

Richard D. Donohoo, Gregory J. Holly, St. Paul, for Heritage State Bank.

David A. Ranheim, Joseph H. Anderson, Minneapolis, for First State Bank of St. Paul.

SIMONETT, Justice.

This case concerns the application of provisions of the Uniform Commercial Code to three banks which found themselves involved in a customer's check kiting scheme.

Richard G. Freitag engaged in a check kiting operation involving personal and corporate checking accounts maintained at five banks. First State Bank of St. Paul, Freitag's main bank, was the center of the kite. Freitag transferred checks back and forth between First State and each of four other banks, but did not transfer checks among the four "periphery" banks. The kite collapsed on March 14, 1980, when First State refused to honor checks drawn on its Freitag accounts. Two of the periphery banks—a bank in Stillwater and one in Pine City—managed to extricate themselves before the kite collapsed. Town & Country State Bank of Newport, however, was left with an overdraft of $71,304.43. First State was left with an overdraft of $690,491.21. Heritage State Bank, on the other hand, attempted to avoid a significant overdraft by returning 30 checks to First State after the kite collapsed. Sixteen of these checks, however, were not timely returned.

Plaintiff-appellant Town & Country commenced this action against defendant First State to recover the $71,304.43 overdraft on the theory that First State Bank, having prior knowledge of the kite, improperly used that knowledge to shift more of the overdraft exposure from itself to Town & Country. Defendant First State counterclaimed for $59,892, the amount of three kited checks drawn on Town & Country which Town & Country had returned to First State unpaid on March 17, 1980, after the expiration of its "midnight deadline." In addition, First State served a third-party complaint against Heritage State Bank for $320,000 for Heritage's belated return of the 16 checks.[1] On Heritage's motion, the third-party claim against it was severed for separate trial. The Town & Country case was tried to a jury, which found First State had acted in bad faith; that the bad faith was not the cause of Town & Country's overdraft; but that the bad faith was the cause of Town & Country's late return of

the three checks totaling $59,892, on which First State's counterclaim was based. The result was that neither party recovered. Town & Country had to absorb its $71,304.43 overdraft loss, and First State was denied its counterclaim. Town & Country appeals from a denial of its post-trial motions for judgment notwithstanding the verdict or a new trial. First State does not appeal the denial of its counterclaim.

Following the Town & Country jury trial, the third party action by First State against Heritage was tried before Judge Summers, who had also presided at the jury trial. The parties waived a jury and stipulated that the judge decide the case on the record made in the Town & Country trial and certain prior hearing testimony, supplemented with the testimony of a Heritage State Bank official. On March 1, 1983, the trial court issued its decision in favor of First State Bank for $320,878 plus prejudgment interest. Heritage appeals from the order denying its post-trial motions and from the judgment. We have consolidated the two appeals.

### I.

The first issue, common to both appeals, may be broadly stated as follows: Did First State, in the manner and at the time it chose to collapse the check kite, act in such bad faith that it, rather than the other two banks, should bear the overdraft losses? Appellant Town & Country does not so much dispute the jury's verdict of no causal bad faith, but rather claims that the jury was incorrectly instructed and that it is entitled to recover on the bad faith issue as a matter of law. Appellant Heritage makes essentially the same legal arguments and further contends the trial court's findings on lack of bad faith are clearly erroneous. We affirm the trial court's rulings.

Banks normally allow customers to write checks on "uncollected funds" in their

---

1. Richard G. Freitag, Judith K. Freitag, Donald England, and Chaparral Homes, Inc., were also made defendants in the third-party action. The Freitags filed for bankruptcy and the other

third-party defendants defaulted, so only Heritage remained as an active third-party defendant at trial.

checking accounts. An uncollected funds balance represents funds posted to the account for deposited checks drawn on another bank, but which have not yet been finally paid by that other bank. A check accepted by the depositary bank is forwarded to its clearinghouse, then on to the payor/drawee bank, which decides whether to pay or dishonor the check. This check collection process usually takes about 2 days. It may occur to a customer who is short of funds that he can obtain a "loan" from the banks by taking advantage of the 2 days it takes for the checks to clear. He proceeds to write a series of checks for deposit and withdrawal on his uncollected fund balances in different banks, each check deposited providing the credit for the preceding check. Thus a kite is born. The kite continues until cash is actually deposited to cover the uncollected funds or until one of the banks refuses to honor a check. When the kite comes to a halt, an overdraft results in accounts consisting solely of uncollected funds.

### A.

Freitag owned a real estate brokerage company and a real estate development company, and, since the early 1970's, banked with First State. He maintained three corporate checking accounts with First State and acquired corporate and personal loans from the bank. He later opened checking accounts with four other banks, including Town & Country and Heritage. At least by early 1979, Freitag's accounts with First State were "problem" accounts. Freitag had a history of overdrafts; his accounts had uncollected fund balances, at times quite substantial; and his company was unprofitable and had a negative net worth. Four months before

the kite collapsed, the bank loaned Freitag $40,000 on an unsecured basis. In January 1980, 2 months before the kite collapsed, bank examiners classified $208,000 of First State's loans to Freitag's corporation as substandard.

In February 1980, the First National Bank of Pine City (Pine City) noticed signs of a kite in its Freitag checking account,[2] and, at least by February 29, the bank president conveyed his concern to First State. On Friday, March 7, First State learned that Pine City had bounced checks, totaling some $250,000, which had been deposited at First State. This prompted Robert Jensen, vice president and second officer of First State, to call in Freitag for a talk that same day. Later that same Friday, Freitag brought in a cashier's check from Pine City for $249,135.[3] Jensen gave Freitag until Monday, March 10, to rectify the situation, then subsequently extended the deadline to Wednesday, March 12. As the daily uncollected funds report for Wednesday was not available until the next morning, Jensen did not contact Freitag until Thursday, March 13, at which time Freitag was told his progress in reaching a collected funds status was unsatisfactory. Freitag responded with a request for a $350,000 loan, saying he could borrow the remaining balance from a friend. Freitag was told to come in Friday morning, March 14, for the bank's answer, but the bank officials testified they decided on Thursday, after the meeting with Freitag, that the loan request would be denied. On Friday morning, March 14, Freitag was told his request for a loan was denied. He asked to have until 3 p.m. to obtain the money. Sometime after 3 p.m. on March 14, First State started returning checks

2. Warning signs of a kite may include overdrafts on checking accounts, deposits primarily from accounts at other banks owned or controlled by the same party, deposits in approximately the same amount, and continued uncollected fund balances. Customers who might be described as "kite suspects" are those in a poor financial situation with a poor cash flow. It should be noted that these are merely signs of a check kite, not conclusive proof of its existence.

3. Town & Country observes that the cashier's check did not represent "real" money. Pine City's bank president testified that he agreed to accept the checks deposited with his bank only after First State promised that those checks, which had been drawn on First State's accounts, would be honored by First State. Thus the cashier's check simply represented Pine City deposits consisting of checks drawn against uncollected funds in Freitag's accounts at First State.

drawn on its Freitag accounts. At the same time, First State stopped presenting for collection Freitag checks drawn on accounts at Town & Country and Heritage. And so the kite collapsed.

First State's officers admitted that they first suspected a check kite on March 7. Given, however, that Freitag was a customer of long standing who had come through on overdrafts before, they felt they should give consideration to Freitag's assurance that he could correct the situation if afforded some time. During this week, from Friday, March 7, through Friday, March 14, Jensen closely monitored the Freitag accounts. He observed continuing signs of a kite, but chose to give continued credence to Freitag's assurances that he could correct the situation if granted some time. During the week of March 7, apparently, the bank at Stillwater started bouncing checks, thus extricating itself from the kite. First State did not relay its suspicion of a kite to either Town & Country or Heritage, and they continued to honor checks; their first notice was the telephone call from the clearinghouse late Friday afternoon, March 14, advising that First State was dishonoring checks drawn on its accounts.

On March 14, before midnight, First State timely returned four checks which had been deposited at Town & Country on March 12. On Monday, March 17, First State timely returned two more checks that had been deposited at Town & Country on March 13. Town & Country, however, did not return any checks drawn on its accounts until Monday, March 17. On Monday it returned eight checks to First State, five within the midnight deadline [4] and three, totaling $59,892, late. The net result for Town & Country was an overdraft of $71,304.43.

As for Heritage, at 3:50 p.m., Friday, March 14, it learned from the clearinghouse that First State was dishonoring checks, totaling $238,664, which had been presented for payment by Heritage. At this time, Heritage had 30 checks drawn on its accounts and presented for payment by First State, all of which it returned to First State on Friday, March 14, or Monday, March 17. Heritage timely returned 14 checks, totaling $384,926, drawn on its Freitag corporate account, by the appropriate midnight deadline, and these checks are not in issue. But Heritage did not timely return six checks, totaling $79,627, drawn on Freitag's personal account, by the midnight deadline. The midnight deadline for these checks was March 14, and Heritage returned them on March 17. It also did not timely return 10 corporate and personal checks totaling $241,251. The midnight deadline for these checks was either March 12 or March 13, and the bank did not return them until March 17. It is these 16 checks, totaling $320,878, which are in issue and for which First State seeks recovery from Heritage.

### B.

Minn.Stat. § 336.1–203 (1982) provides: "Every contract or duty within this chapter imposes an obligation of good faith in its performance or enforcement." The parties and the trial court agreed, therefore, that First State had a duty to act in good faith towards Town & Country and Heritage in its handling of the Freitag kite operation, and it was on this fact issue that both cases were tried.

The Town & Country jury, as already noted, by answers to special interrogatories, found that First State had acted in bad faith but that the bad faith was not a cause of Town & Country's overdraft, although it was a cause of Town & Country's payment of the three checks totaling $59,-892. Town & Country says the jury must have determined that First State did not begin to act in bad faith until Thursday,

---

**4.** Minn.Stat. § 336.4–302 (1982) provides that in the absence of a valid defense a payor bank is accountable for a demand item received by it when the bank, "where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline."

March 13, when its officers decided to deny Freitag's loan request.

On appeal, Town & Country seems to concede there was evidence, under the court's instructions, to sustain the jury's verdict that First State did not act in bad faith on the $71,304.43 overdraft. Town & Country contends, however, that the trial court incorrectly instructed the jury on what constitutes good faith. It argues that actual knowledge of a check kite by a presenting bank is bad faith, and it claims that its requested instruction to that effect was erroneously denied by the trial court. Town & Country's argument here is that the evidence overwhelmingly shows that First State knew of the check kite, surely by March 7 when alerted by Pine City, and, therefore, as a matter of law, First State acted in bad faith to Town & Country's detriment. We disagree.

■ The trial court instructed the Town & Country jury that good faith "is honesty in fact or put another way, honesty in intent." This was a correct statement of the law. Section 336.1–201(19) (1982) defines good faith as "honesty in fact in the conduct or transaction concerned." This is a subjective test, requiring "honesty of intent rather than absence of circumstances which would put an ordinarily prudent holder on inquiry." *Eldon's Super Fresh Stores, Inc. v. Merrill Lynch, etc.,* 296 Minn. 130, 136, 207 N.W.2d 282, 287 (1973). The trial court applied the same legal standard in the Heritage bench trial.

■ First State's subjective good faith towards the two payor banks was an issue for the trier of fact and we affirm those findings. The trier of fact chose to believe that First State's officers, even though aware of the ominous danger signals of a kite and, indeed, strongly suspecting a kite, nevertheless believed that giving Freitag a week's time to work out his problem was warranted and that in extending this time, First Bank's officers had no dishonest intent to shift the kite loss to the other banks. Town & Country's theory seems inconsistent with the fact that on March 10, for example, First State's overdraft liability was only about $90,000 and that the further extension of time greatly increased First State's own overdraft exposure. Then too, at the same time First State began returning checks drawn on its accounts, it also stopped presenting checks for collection on the other banks. As the trial court's memorandum for the Heritage bench trial decision states, "[N]othing in First State's experience with Freitag indicates that it thought him a crook, or that it knowingly participated in his kiting scheme. The court believes that Freitag's long-established banking relationship with First State makes it more, rather than less, reasonable for First State to 'carry' him for awhile to see if he could work out his cash flow problem."

■ Signs of a check kite may be only that—just signs—and, in any event, even if a kite is known to exist, the best remedy is an infusion of cash, if it can be obtained. The proper course of action is not always easy to determine. This difficulty is illustrated not only by First State's conduct, but by that of Town & Country and of Heritage. All three banks knew of Freitag's precarious finances. All three banks had substantial uncollected fund balances in their Freitag accounts. Town & Country argues it did not suspect a kite because its officers did not look at their bank's daily uncollected funds balance—not an especially persuasive argument. The Pine City bank, having noticed the kite signs, took positive action on its own as early as March 7, followed by the Stillwater bank. At Heritage State Bank, the average uncollected fund balance in Freitag's corporate checking account during the month of February 1980 was $208,924 compared with an average of $7,000 in "real money." Yet on March 7, knowing this, Heritage chose to do nothing more than write an innocuous letter to Freitag stating, "If it is possible for you to delay writing checks for one day the problem can be alleviated. I will appreciate your efforts in remedying the situation." Thereafter, Heritage did nothing until First State acted.

We hold that the trial court applied the proper standard for good faith. The trial court's findings of no bad faith in the bench trial are not clearly erroneous and are affirmed. In the jury trial, respondent First State is not challenging the jury's verdict as to its bad faith, and to the extent Town & Country is claiming that First State's bad faith as a matter of law caused the $71,304.43 overdraft, we rule that claim is without merit.

## II.

■ Appellants urge another theory, however, on which liability for the kite losses should rest solely with First State. They contend that, even in the absence of bad faith by a presenting bank (such as First State), and even though a payor bank (such as themselves) has made final payment, a payor bank is relieved of liability if the presenting bank is not a holder in due course or a person who has in good faith changed his position in reliance on such payment. We decline to subscribe to this theory.

For an understanding of the issue, we must look to provisions of the Uniform Commercial Code. Article 4 deals with bank deposits and collections. Minn.Stat. § 336.4–213 describes when an item is deemed "finally paid" by a payor bank, and then concludes, "Upon a *final payment* under subparagraph (b), (c) or (d) the payor bank *shall be accountable* for the amount

of the item." (Emphasis added.)[5] To the same effect is Minn.Stat. § 336.4–302 (1982).[6]

Here both Town & Country and Heritage made "final payment" on checks presented to them. Town & Country charged the checks presented to it by First State against its Freitag accounts. Heritage failed to dishonor the checks presented to it within the midnight deadline. Consequently, First State argues that under section 4–213, the two payor banks are "accountable for the amount of the item[s]." U.C.C. Comment 7 to section 4–213 defines "accountable" as "imposing a duty to account, which duty is met if and when a settlement for the item satisfactorily clears." The comment goes on to say, the "determination of the time of final payment is based exclusively on the action of the payor bank." Therefore, argues First State, both Town & Country and Heritage are accountable, *i.e.*, Town & Country has no right to recover its final payment of $71,000, whether or not properly payable, and neither may Heritage refuse to pay the checks totaling $320,000 which it failed to timely dishonor. There is considerable support for this position. *See Ashford Bank v. Capital Preservation Fund, Inc.*, 544 F.Supp. 26 (D.Mont.1982); *Northwestern National Insurance Co. v. Midland National Bank*, 96 Wis.2d 155, 292 N.W.2d 591 (1980); *Kirby v. First and Merchants National Bank*, 210 Va. 88, 91 n. 4, 168

**5.** Minn.Stat. § 336.4–213(1) (1982) reads in its entirety as follows:

(1) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

(a) Paid the item in cash; or

(b) Settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearinghouse rule or agreement; or

(c) Completed the process of posting the item to the indicated account of the drawer, maker or other person to be charged therewith; or

(d) Made a provisional settlement for the item and failed to revoke the settlement in the time and manner permitted by statute, clearinghouse rule or agreement.

Upon a final payment under subparagraphs (b), (c) or (d) the payor bank shall be accountable for the amount of the item.

**6.** Minn.Stat. § 336.4–302 (1982) provides:

In the absence of a valid defense such as breach of a presentment warranty (subsection (1) of section 336.4–207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of

(a) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline.

S.E.2d 273, 275 n. 4 (1969); J. White and R. Summers, *Handbook of the Law under the Uniform Commercial Code*, § 16–2 at 613–18 (2d ed. 1980);[7] B. Clark, *The Law of Bank Deposits, Collections and Credit Cards*, § 3.6[3] at 3–38 to 3–40 (1981).

On the other hand, appellants argue that "final payment" under section 4–213 only fixes the *time* at which final payment occurs, *i.e.*, when notice, stop payment orders, legal process and set-off will not prevent the payment of an instrument. Appellants argue that one must look to Article 3 of the Code, specifically section 3–418, to determine the *effect* of final payment. They rely, therefore, on Minn.Stat. § 336.-3–418 (1982), which reads:

> Except for recovery of bank payments as provided in the article on bank deposits and collections (article 4) and except for liability for breach of warranty on presentment under the preceding section, payment or acceptance of any instrument is final in favor of a holder in due course, or a person who has in good faith changed his position in reliance on the payment.

Appellants argue that this statutory language means payment is only final, in the sense that it cannot be reversed or recovered by the payor bank, when the payment has been made to a holder in due course or a person who has changed his position in reliance on the payments. Conversely, payments made to one who is not a holder in due course or who has not changed position may be recovered. Appellants argue that the introductory clause of section 3–418, which says, "Except for recovery of bank payments as provided in * * * (article 4)," merely intends to preserve a payor bank's right to revoke a payment or settlement before its midnight deadline, even though the person receiving payment is a holder in due course. Therefore, so goes appellants' argument, Town & Country can seek reimbursement of the $71,000 it paid First State, and Heritage, notwithstanding its untimely dishonor, can refuse to pay First State on the Freitag checks for $320,-000 presented to it. If First State is neither a holder in due course nor a person who has changed his position in reliance on payment, then the payor banks can impose liability for the kited checks on First State by showing they were induced to act as they did by fraud or mistake.[8] There is

---

7. Professor White appears to have since partially changed his analysis. Responding to a criticism of his position in a student note, *Commercial Paper and Forgery: Broader Liability for Banks?* 1980 U.Ill.L.F. 813 (1980), Professor White now seems to advocate interpreting the word "accountable" in section 4–213 to mean only that a bank must settle for an item. Final payment under this section thus cuts off a bank's unqualified right to revoke a provisional credit but does not bar restitution. But he also states that Section 4–302 "accountability," which operates whether an instrument is "properly payable or not," would continue to bar restitution where the bank holds the instrument beyond the midnight deadline without settling for it. Professor White's new position appears in an informal comment to teaching materials on the relationship between sections 3–418 and 4–213. D. Epstein and J. Martin, *Basic Uniform Commercial Code Teaching Materials* 514 (2d ed. 1983), *cited in National Savings and Trust Co. v. Park Corp.*, 722 F.2d 1303, 1306 (6th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1916, 80 L.Ed.2d 464 (1984). We do not think, however, the drafters intended the essentially identical language on accountability which appears in both sections 4–213 and 4–302 to have different consequences.

8. Even if the appellant payor banks were able to persuade us that Article 3 affords them an avenue of recovery, they would still have two other hurdles to overcome. First, to show that First State was not a holder in due course, they would have to show that First State had "notice" of a defense against presentment of the checks. Minn.Stat. § 336.3–302(1) (1982). Even though the triers of fact found no subjective bad faith, appellants argue that "notice," in the context of a holder in due course, involves an objective test of what the holder knows or has reason to know. *See* Minn.Stat. § 336.1–201(25) (1982) (definition of "notice"); *Eldon's Super Fresh Stores, Inc. v. Merrill Lynch, etc.*, 296 Minn. 130, 136, 207 N.W.2d 282, 287–88 (1973).

If appellants were able to establish that First State was not a holder in due course, they would still have to establish their right to recovery from First State on some theory of restitution. *See, e.g., Demos v. Lyons*, 151 N.J.Super. 489, 376 A.2d 1352 (1977). Appellants suggest either fraud or mistake. But the trial court at the Town & Country trial dismissed plaintiff's fraud claim, in part at least, because he found no fiduciary relationship between the banks, and this ruling has not been appealed. As for mistake, Town & Country says in its brief that it

also support for this position. *See, e.g., Demos v. Lyons,* 151 N.J.Super. 489, 376 A.2d 1352 (1977); *National Savings & Trust Co. v. Park Corp.,* 722 F.2d 1303 (6th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1916, 80 L.Ed.2d 464 (1984); *Blake v. Woodford Bank & Trust Co.,* 555 S.W.2d 589, 601 (Ky.App.1977); Note, *Commercial Paper and Forgery: Broader Liability for Banks?* 1980 U.Ill.L.F. 813, 830 (1980).

Admittedly, the code provisions and comments are unclear, but to say that the final payment provisions of Article 4 are only given effect under the dictates of section 3–418 would render those sections of Article 4 virtually meaningless. Furthermore, a finality rule has the advantage of simplicity, obviating the need for courts to be "forever wrestling with fine fact questions involving reliance, negligence, notice, damages, and the concept of holder in due course." B. Clark, *supra,* § 3.6[3] at 3–40. The finality rule is also most consistent with the policies underlying the final payment provisions. The present banking system under which an enormous number of checks are processed daily could not function effectively if banks were not required to make prompt and effective decisions on whether to pay or dishonor checks. *See Bank Leumi Trust Co. v. Bank of Mid-Jersey,* 499 F.Supp. 1022, 1026 (D.N.J. 1980). *See also Van Senus Auto Parts, Inc. v. Michigan National Bank—Wyoming,* 116 Mich.App. 342, 348–49, 323 N.W.2d 391, 394 (1982). Lastly, appellants' interpretation creates an inevitable and direct conflict between the requirements of Articles 3 and 4, and the Code requires that the provisions of Article 4 prevail in the event of a conflict with Article 3. *See* Minn.Stat. § 336.4–102(1) (1982).

■ We hold, therefore, that the final payment provisions of Minn.Stat. §§ 336.4–213 and 336.4–302 are not limited by the holder in due course and reliance requirements of section 336.3–418.[9]

### III.

Several minor issues remain, in particular, Heritage's claim that First State should be collaterally estopped from denying it acted in bad faith towards Heritage.

### A.

In the Town & Country trial the jury found that First State acted in bad faith. Yet in the subsequent Heritage bench trial, Judge Summers concluded that First State did not act in bad faith. Heritage claims that the trial court should have been precluded in its case from reconsidering the threshold fact issue of First State's bad faith and should have decided only the issue of whether the bad faith caused Heritage's loss.

■ Even though not a party to the first trial, Heritage may invoke collateral estoppel against First State if the bad faith issue in its trial is identical to the bad faith issue litigated and decided in the Town & Country trial. Bad faith does not exist in a vacuum. Involving, as it does, a subjective state of mind, it must have a time reference and be directed against someone. It appears the jury found First State's bad faith towards Town & Country did not exist until Thursday, March 13, so consequently that finding is not inconsistent with the trial court's conclusion that there was no bad faith towards Heritage with respect to the $241,000 worth of checks presented by First State to Heritage on or before Wednesday, March 12. Nor, with respect to the remaining checks presented

---

paid the checks "in the mistaken belief that Anderson-Freitag, Inc. had good funds in the T & C account," while First State argues this is not the kind of mistake that will support restitution.

**9.** The interpretation of the Article 4 final payment provisions adopted by this court significantly limits the scope of section 3–418. The holder in due course and good faith reliance exceptions to final payment will presumably apply to notes and other instruments presented outside the bank collection system. J. White and R. Summers, *supra,* § 16.2 at 617. For instance, section 4–213 would not apply to payment of a draft by a buyer-drawee because the buyer would not be a payor bank.

later, does it necessarily follow that any bad faith intent of First State towards Town & Country was also directed at Heritage. We cannot say that the trial court erred in refusing to apply collateral estoppel.

### B.

At the Town & Country trial, the trial court ruled as a matter of law that First State had not breached any of its warranties of presentment on the checks presented by First State to Town & Country. We affirm this ruling.

 Under Minn.Stat. § 336.4–207 (1982) a presenting bank warrants to the payor bank that it "has no knowledge that the signature of the maker or drawer is unauthorized." An unauthorized signature is "one made without actual, implied or apparent authority and includes forgery." Minn.Stat. § 336.1–201(43) (1982). Town & Country argues that "fraud can never be authorized" and therefore the check signatures were not authorized. There is no merit to this claim. The checks were signed by Freitag and Donald England, persons authorized to sign checks on behalf of the companies involved. Whatever may have been wrong with the checks, it was not with the signatures.

Finally, Heritage claims it was excused from sending a notice of dishonor within the midnight deadline because Minn. Stat. § 336.3–511(2)(b) excuses "presentment or notice or protest" if "such party * * has no reason to expect or right to require" that an item be paid. Here again appellant seeks to insinuate an Article 3 provision into the check collection process established by Article 4. Article 4 already provides a defense to the duty to account if there is delay in dishonoring—namely, if the delay is due to circumstances beyond the bank's control. Article 3 would, therefore, conflict with Article 4, and this is not permitted. Moreover, section 336.3–511(2)(b) clearly refers to "such party"— i.e., "the party to be charged," which normally is the drawer or endorser who would be liable on the instrument itself. First

State is not such a party. *See Northwestern National Insurance Co. v. Midland National Bank,* 96 Wis.2d 155, 166, 292 N.W.2d 591, 597–98 (1980); *Available Iron & Metal Co. v. First National Bank,* 56 Ill.App.3d 516, 13 Ill.Dec. 940, 371 N.E.2d 1032, 1043 (1977). *See also* C. Edwards, *Recovery of Final Payments Under the Uniform Commercial Code,* 6 Ohio N.U.L. Rev. 341, 353 n. 66 (1979). The trial court correctly ruled that section 336.3–511 does not excuse Heritage's failure to timely dishonor the checks.

Affirmed.